JOINER, Judge.[1]
Casey A. McWhorter appeals the circuit court’s denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P. We affirm.
In March 1994, McWhorter was convicted of capital murder in connection with the death of Edward Lee Williams because it was committed during the course of a first-degree robbery. See § 13A-5-40(a)(2), Ala.Code 1975. Following the penalty phase, the jury, by a vote of 10-2, recommended that McWhorter be sentenced to death. The circuit court accepted the jury’s recommendation and sentenced McWhorter to death.
This Court affirmed McWhorter’s conviction and sentence on direct appeal. See McWhorter v. State, 781 So.2d 257 (Ala.Crim.App.1999) (“McWhorter I”). The Alabama Supreme Court affirmed this Court’s judgment, Ex parte McWhorter, 781 So.2d 330 (Ala.2000) (“McWhorter II”), and the United States Supreme Court subsequently denied certiorari review on April 16, 2001. McWhorter v. Alabama, 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001).
On April 11, 2002, McWhorter, through counsel, filed a timely Rule 32 petition in the Marshall Circuit Court, attacking his conviction and death sentence. The case was assigned to Judge David Evans, who did not preside over McWhorter’s trial and who retired in 2007.[2] The State filed an answer and a motion to dismiss McWhorter’s petition. After several years of litigation, on February 28, 2005, McWhorter filed the amended Rule 32 petition that is the subject of this appeal, in which he reasserted and expanded the claims asserted in his original Rule 32 petition. On May 11, 2005, the State filed an answer *1203 and a motion to dismiss certain claims in McWhorter’s amended petition, and McWhorter responded. A postconviction evidentiary hearing was held on September 27, 2005, and Judge Evans subsequently issued an order, dated October 19, 2006, and filed on November 1, 2006, summarily dismissing several of the claims in McWhorter’s amended petition on the grounds that the claims were insufficiently pleaded, were meritless on their face, or were procedurally barred.
McWhorter and the State also filed several motions for discovery that were not ruled on before Judge Evans retired in 2007. After Judge Evans retired, Judge Liles C. Burke, who was then a Marshall County district court judge, was appointed as a special circuit court judge, and he considered and ruled on the discovery motions. Judge Burke conducted a postcon-viction evidentiary hearing on August 26-28, 2009, on the remaining claims in McWhorter’s petition that had not been summarily dismissed.
Following the postconviction hearing, McWhorter filed a brief for the circuit court’s consideration. On March 29, 2010, the circuit court denied McWhorter’s post-conviction petition in a lengthy, 77-page written order. McWhorter subsequently filed an objection to the circuit court’s order, which the circuit court denied. This appeal followed.

Background

This Court’s decision on direct appeal provides a detailed account of the facts of McWhorter’s crime as originally set out by the circuit court in its sentencing order. See McWhorter I, 781 So.2d at 265-66. Thus, we will not repeat those facts, many of which are not relevant to the issues now before this Court. In addition to the facts we state here, where further facts are necessary and relevant to the resolution of the postconviction claim presented, they will be set out in the corresponding section of this opinion. This Court has taken judicial notice of all of its records relating to McWhorter’s previous proceeding. See Nettles v. State, 731 So.2d 626, 629 (Ala.Crim.App.1998); Hull v. State, 607 So.2d 369, 371 n. 1 (Ala.Crim.App.1992).
On appeal from the denial of his post-conviction claims, McWhorter raises claims of juror misconduct during jury selection and deliberation; ineffective assistance of penalty-phase counsel in failing to object to the sentencing order and in failing to further investigate and present additional mitigating evidence; improper exclusion of evidence at the postconviction hearing on the grounds that it was hearsay or was not set forth in the amended Rule 32 petition; a Brady[3] violation for the State’s alleged failure to disclose mitigation evidence; and ineffective assistance of trial counsel in failing to object to McWhorter’s being transported in and out of the courtroom in handcuffs in view of the jury. McWhorter originally presented 12 claims in his amended Rule 32 petition. The circuit court summarily dismissed claims I-IV, V(B), V(C), VI-VIII, X, and XI. The circuit court conducted an evidentiary hearing on claims V(A) (juror misconduct) and claims IX(A) and XII (ineffective assistance of penalty-phase counsel) before denying those claims.
At the penalty-phase proceeding, McWhorter’s attorneys’ presented evidence in mitigation that McWhorter had had a difficult childhood and was a “good kid” who became involved with the wrong crowd. Vonnie Salee, who had worked with McWhorter at the Food World grocery store, testified that McWhorter was one of the better bag boys and was a hard *1204 worker. Van Reid, who had employed McWhorter as a busboy at his restaurant, described McWhorter as a good kid and a dependable worker. Elsie Garrison, McWfiiorter’s paternal aunt, testified that McWhorter was 2 when his parents divorced and that he lived with her when he was 16 years old because his mother believed he was using drugs, which belief Garrison stated proved to be false. Garrison described her nephew as a very bright, intelligent, compassionate young man who had had a difficult childhood. Carolyn Rowland, McWhorter’s mother, stated that she divorced McWhorter’s father, remarried shortly thereafter, and moved to Tennessee. According to Rowland, because McWhorter was so young when she divorced his father and moved to Tennessee that he believed that his stepfather, David Rowland, was his father. She stated that they moved back to Marshall County when McWhorter was five years old and he was told sometime shortly thereafter that his father was Tommy McWhorter. According to Rowland, as McWhorter matured in age, his biological father instructed him that he did not have to listen to David Rowland, his stepfather. Rowland described McWhorter as a good, respectful kid until he became involved with the wrong crowd when he was around 16 years old.
In its sentencing order, the trial court found one aggravating circumstance — that the capital offense was committed while McWhorter was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit a robbery. The trial court found two statutory mitigating circumstances: (1) that McWhorter had no significant history of prior criminal activity, and (2) McWffiorter’s age — he was only 18 years old at the time of the offense. As to nonstatutory mitigating circumstances, the trial court found that McWTiorter had had “a difficult childhood following the divorce of his parents, a good reputation, and a substantially good record for a person his age.” McWhorter I, 781 So.2d at 330. After also considering the jury’s advisory verdict of death, the trial judge concluded that the one statutory aggravating circumstance outweighed the statutory and nonstatutory mitigating circumstances and sentenced McWhorter to death.
Specifically, this Court, on direct appeal, stated as follows in considering the constitutionally of the trial court’s sentencing order as to the aggravating circumstance and the mitigating circumstances:
“In the present case, the trial court entered a sentencing order specifically setting out the statutory mitigating circumstances and stated that it had thoroughly and conscientiously considered all statutory and nonstatutory mitigating circumstances that reasonably pertained to the case, particularly the evidence presented by the appellant at trial, as well as the evidence of mitigating circumstances presented by the appellant at the sentencing phase. The trial court found that the appellant’s age — he was 18 years old at the time of the offense— constituted a mitigating circumstance, but that the statutory mitigating circumstance concerning the appellant’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law at the time of the offense did not exist. The trial court further found, as nonstatutory mitigating circumstances, that the appellant had ‘a far less than perfect childhood following the divorce of his parents, a good reputation with at least some individuals and a substantially good work record for a person his age.’ The sentencing order further states that the trial court carefully weighed the one existing statutory aggravating circum *1205 stance, i.e., that the capital offense was committed while the appellant was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit a robbery, against the statutory and nonstatutory mitigating circumstances. The trial court also carefully considered the jury’s advisory recommendation of death, and found that the aggravating circumstance outweighed the mitigating circumstances. There is no indication in the record that the trial court abused its discretion in arriving at this determination and, because of the lack of evidence presented by the appellant concerning his possible intoxication, the trial court’s finding that that mitigating circumstance did not exist was not improper.”
McWhorter I, 781 So.2d at 310.

Postconviction Evidentiary Hearing

As to the juror-misconduct claims, McWhorter presented at the postconviction evidentiary hearing the testimony of Jurors L.B. and A.S., who both served on McWhorter’s jury.[4] McWhorter claims that Juror L.B. committed juror misconduct because she did not disclose the story of her father’s death when defense counsel asked the venire on a juror questionnaire and during voir dire if anyone had a family member who had been the victim of a crime. He asserts that the misconduct denied him the ability to use his peremptory strikes effectively and to make any challenges for cause.
Regarding the ineffective-assistance-of-counsel claims, McWhorter presented the testimony of Thomas E. Mitchell and James R. Berry, McWhorter’s trial attorneys. Mitchell testified that he was appointed as lead counsel to represent McWhorter. He stated that, at the time of his appointment, he had been practicing law for 11 years and had handled approximately 10 murder trials. James Berry, who was appointed to serve as cocounsel, testified that, at the time of his appointment, he had been practicing law for 4 years and had handled approximately 10 jury trials, one being a capital-murder case in which the defendant received a sentence of life imprisonment without the possibility of parole.
As to the jury-selection process, Mitchell and Berry requested a juror questionnaire and an individual voir dire of the prospective jurors. Mitchell stated that the circuit court judge allowed the juror questionnaire and individual voir dire on a limited basis. As to question 21 on the juror questionnaire, which asked, “Have you or any member of your family or anyone you know ever been the victim of a crime?” he recalled following up with any prospective jurors who answered that question affirmatively.[5] He stated that he challenged some of the prospective jurors for cause after they were individually questioned concerning their response to question 21. Berry stated that he did not disagree with any of Mitchell’s challenges.
Regarding penalty-phase preparation, Mitchell and Berry testified that they interviewed McWhorter and his mother Carolyn Rowland, his aunt Elsie Garrison, and his half sister Melissa Rowland.[6] According to Mitchell, they interviewed the three together so that they could all “[put] [their] heads together and play off of each other.” (R. 164.) During the interview, *1206 Mitchell testified that he completed a document entitled “Client Background Information.” It included questions and answers on topics such as McWhorter’s early childhood development; his environment, such as living conditions, medical issues, and relationship information; his education history and medical and mental-health history; and his substance-abuse history, criminal history, and family history. Mitchell testified that “fw]e didn’t interview anybody except those witnesses that either Mr. McWhorter or his mother or his aunt or his sister recommended to us as people that they believed that could and would offer testimony favorable to him.” (R. 153.) Mitchell and Berry stated that McWhorter’s family informed them that most of McWhorter’s friends were involved in gang activity or were also charged with murder and would not provide helpful mitigation testimony. None of McWhorter’s family indicated to Mitchell that the “divorce was a big thing in Mr. McWhorter’s life.” (R. 182.) Both Mitchell and Berry testified that they believed that testimony about his father’s criminal history or his family’s alcohol abuse and physical and emotional abuse would not have been helpful in mitigation.
Mitchell and Berry stated that they decided not to hire an investigator for the penalty-phase preparation because they could formulate a strategy for the penalty phase with McWhorter’s and his family’s assistance, without an investigator. Mitchell and Berry testified, however, that they hired Dr. Douglas Robbins, a [neu-ropsychologist,] to evaluate McWhorter for any mental disease, mental disorder, or any evidence of psychopathology. According to Mitchell, Dr. Robbins’s evaluation provided no useful mitigation evidence such as evidence of diminished capacity or of susceptibility to influence from others. Mitchell and Berry also stated there was no indication of brain damage resulting from McWhorter’s alleged alcohol abuse, drug use, or ingesting or “huffing” freon or gasoline.[7] Both testified that McWhorter indicated that he never suffered brain damage or any brain injury that would result in mental impairment. Mitchell stated that he did not believe that alcoholism or drug abuse by McWhorter or his family members would have been helpful in mitigation because there were no resulting consequences from any use or abuse. (R. 205.)
Mitchell and Berry stated that they obtained hospital records from an incident in which McWhorter had attempted suicide. Mitchell testified that, although they were aware that the Department of Human Resources (“DHR”) had once investigated an allegation of physical abuse involving McWhorter, they did not request those records because they had discussed the allegation with McWhorter’s mother and aunt, both of whom discredited it. Additionally, Mitchell stated that they had documentation of McWhorter’s IQ scores, which indicated he had an IQ of 88 at the time of testing.
According to McWhorter’s trial attorneys’ testimony, they decided that because McWhorter was a clean-cut, handsome young man, they would present a “good boy, wrong crowd” strategy to show during the penalty phase that McWhorter did not deserve the death penalty. Mitchell testified that they presented the testimony of four witnesses during the penalty phase: Rowland (McWhorter’s mother), Garrison (McWhorter’s aunt), Reid (the owner of a restaurant where McWhorter had been employed), and Salee (a cashier at a grocery store where McWhorter had been employed). Counsel selected Rowland and *1207 Garrison because they knew McWhorter well and, counsel said, their pain over McWhorter’s trial was “obvious.” Counsel hoped their testimony would evoke sympathy from the jury. Both testified that McWTiorter was a “good kid” who had fallen in with the wrong crowd, particularly the codefendants, who had already pleaded guilty. Mitchell stated that Reid and Salee were selected to testify because they knew McWhorter to be a good worker. Mitchell indicated that Salee was also chosen because she was described as “very likable.”
At the postconviction evidentiary hearing, McWhorter also presented the testimony of several lay witness to testify about his background and childhood, including Garrison, McWhorter’s aunt; Tiffany Long, McWhorter’s high-school girlfriend; David Rowland, McWhorter’s stepfather; Larry Evans, McWhorter’s uncle; Michael Evans, McWhorter’s cousin; Frank Baker, McWhorter’s middle-school basketball coach; Kenneth Burns, McWhorter’s middle-school science teacher; and Amy Battle and Abraham Barnes, McWhorter’s high-school friends. Garrison described McWhorter’s development and childhood and explained that McWhorter was shuffled between her house and Carolyn and David Rowland’s house around the age of 8 and again at the age of 16. She explained that Tommy McWhorter, her brother, and McWhorter’s biological father, abandoned McWhorter at an early age, never really acknowledged his son, and was a criminal and an alcoholic. Michael Evans and Larry Evans indicated that McWhorter was exposed to violence during his adolescent years when he spent time during the weekends at his maternal grandparents’ house. They explained that many members of McWhorter’s mother’s family were alcoholics and addicts. They stated that McWhorter’s maternal grandfather, a known alcoholic, committed a homicide and regularly physically abused his wife and children. They also testified that they, along with McWhorter, sniffed gasoline and freon on occasion from the time McWhorter was 8 years old until he reached the age of 14.
David Rowland also testified that he caught McWhorter ingesting gasoline one time when McWhorter was about 14 years old. He stated that McWhorter became “unruly” when he was around 10 years old. (R. 363.) David Rowland testified that, when McWhorter was around 16, he stole Rowland’s truck on one occasion. He stated that McWhorter’s mother and he did not like McWhorter spending time with Marcus Carter, Daniel Minor, and Lee Williams, who were McWhorter’s codefen-dants, during his senior year of high school just before the commission of the crime.
Abraham Barnes, Tiffany Long, and Amy Battle testified that McWhorter’s emotional state declined shortly before the crime was committed. Battle testified that McWhorter was a kind and loyal friend. Barnes testified that McWhorter and he used drugs of all types beginning at around the age of 16. Barnes stated that McWhorter and he often played “roulette” with their pistols while they were drinking.[8] Long testified that she dated McWhorter for several months before he was arrested in February 1993. She stated that every time they were together they consumed alcoholic beverages. Long testified that she broke up with McWhorter shortly before the crime. She stated that McWhorter was extremely distraught over their break up and tried to reconcile with her several times in the weeks before the *1208 crime. Long testified that McWhorter had learned in the fall of 1992 that his biological father had terminal cancer. McWhorter’s middle-school teachers testified that he was a good kid and an average student who worked hard.
Dr. Ralph Tarter, a clinical psychologist and Janet Vogelsang, a clinical social worker, testified about how they could have served as expert witnesses to explain to the jury the significance of McWhorter’s family and medical history on his behavior. Vogelsang testified that she has served as a mitigation specialist in numerous capital cases. Dr. Tarter testified that he believed McWhorter was affected by his dysfunctional family and history of substance abuse. The State presented the testimony of Dr. Douglas Robbins, a clinical [neurop-sychologist,] who examined McWhorter and prepared a report.

Standard of Review

McWhorter initiated this postconviction proceeding. According to Rule 32.3, Ala. R.Crim. P., McWhorter has the sole burden of pleading and proof “by a preponderance of the evidence.” Rule 32.3, Ala. R.Crim. P. (emphasis added). “Preponderance of the evidence” is defined as
“[t]he greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other.”
Black's Law Dictionary 1220 (8th ed.2004). It is important, however, to distinguish between McWhorter’s burden of pleading and his burden of proving.
“[A]t the pleading stage of Rule 32 proceedings, a Rule 32 petitioner does not have the burden of proving his claims by a preponderance of the evidence. Rather, at the pleading stage, a petitioner must provide only ‘a clear and specific statement of the grounds upon which relief is sought.’ Rule 32.6(b), Ala. R.Crim. P.”
Ford v. State, 831 So.2d 641, 644 (Ala.Crim.App.2001).
The burden of pleading, however, is a heavy one. Hyde v. State, 950 So.2d 344, 356 (Ala.Crim.App.2006). Rule 32.6(b), Ala. R.Crim. P., states that “[a] bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.” In Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003), we explained:
“ ‘Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.’ Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not the pleading of a conclusion ‘which, if true, entitle[s] the petitioner to relief.’ Lancaster v. State, 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R.Crim. P., to present evidence proving those alleged facts.”
913 So.2d at 1125. This Court has further explained:
“Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied *1209 the burden of pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So.2d 724 (Ala.Crim.App.2003).”
Hyde, 950 So.2d at 356. “The pleading requirements of Rule 32 apply equally to capital cases in which the death penalty has been imposed.” Taylor v. State, [Ms. CR-05-0066, October 1, 2010] — So.3d —,—(Ala.Crim.App.2010).
If a postconviction petitioner has not met his burden of pleading facts that, if true, entitle him to relief, then Rule 32.7(d), Ala. R.Crim. P., provides for the summary disposition of a postconviction claim:
“If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.”
Regarding summary dismissal, this Court has stated:
“[A] circuit court may, in some circumstances, summarily dismiss a post-conviction petition based on the merits of the claims raised therein. Rule 32.7(d), Ala. R.Crim. P., provides:
“‘If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.’
“ ‘ “Where a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition.” ’ Bishop v. State, 608 So.2d 345, 347-48 (Ala.1992) (emphasis added) (quoting Bishop v. State, 592 So.2d 664, 667 (Ala.Crim.App.1991) (Bowen, J., dissenting)). See also Hodges v. State, [Ms. CR-041226, March 23, 2007] — So.3d —, — (Ala.Crim.App.2007) (a postconviction claim is ‘due to be summarily dismissed [when] it is meritless on its face’).”
Bryant v. State, [Ms. CR-08-0405, February 4, 2011] — So.3d —, — (Ala. Crim.App.2011). See also Moore v. State, 502 So.2d 819, 820 (Ala.1986). “ ‘In addition, “[t]he procedural bars of Rule 32[.2, Ala. R.Crim. P.] apply with equal force to all cases, including those in which the death penalty has been imposed.” ’ ” Burgess v. State, 962 So.2d 272, 277 (Ala.Crim.App.2005) (quoting Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995), quoting in turn State v. Tarver, 629 So.2d 14, 19 (Ala.Crim.App.1993)).
“Once a petitioner, [however,] has met his burden of pleading so as to avoid summary disposition pursuant to Rule 32.7(d), Ala. R.Crim. P., he is then entitled to an opportunity to present evidence in order to satisfy his burden of proof’ pursuant to Rule 32.9, Ala. R.Crim. P. Ford, 831 So.2d at 644. Furthermore, this Court, in regard to findings made by the circuit court at an evidentiary hearing in postcon-viction proceedings, has explained:
*1210 “ ‘The resolution of ... factual issue[s] required the trial judge to weigh the credibility of the witnesses. His determination is entitled to great weight on appeal.... “When there is conflicting testimony as to a factual matter ..., the question of the credibility of the witnesses is within the sound discretion of the trier of fact. His factual determinations are entitled to great weight and will not be disturbed unless clearly contrary to the evidence.” ’
“Calhoun v. State, 460 So.2d 268, 269-70 (Ala.Crim.App.1984) (quoting State v. Klar, 400 So.2d 610, 613 (La.1981)).”
Brooks v. State, 929 So.2d 491, 495-96 (Ala.Crim.App.2005).
“ ‘When reviewing a circuit court’s denial of a Rule 32 petition, this Court applies an abuse-of-discretion standard.’ ” Shouldis v. State, 38 So.3d 753, 761 (Ala.Crim.App.2008) (quoting Whitman v. State, 903 So.2d 152,154 (Ala.Crim.App.2004), citing in turn McGahee v. State, 885 So.2d 191 (Ala.Crim.App.2003)). “[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, [however,] that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001) (citing State v. Hill, 690 So.2d 1201, 1203 (Ala.1996)). “Moreover, ‘when reviewing a circuit court’s rulings made in a postconviction petition, we may affirm a ruling if it is correct for any reason.’ ” Lee v. State, 44 So.3d 1145, 1149 (Ala.Crim.App.2009) (quoting Bush v. State, 92 So.3d 121, 134 (Ala.Crim.App.2009)). Lastly, in a death-penalty case, “[o]n direct appeal we reviewed the record for plain error; however, the plain-error standard of review does not apply to a Rule 32 proceeding attacking a death sentence.” Ferguson v. State, 13 So.3d 418, 424 (Ala.Crim.App.2008).
Guided by these principles, we review McWhorter’s claims in turn.
I.
McWhorter argues his rights to a fair trial by an impartial jury, to the free exercise of peremptory challenges, and to due process were violated by the alleged misconduct of Juror L.B. He claims that the circuit court erred in denying and dismissing his juror-misconduct claims. (Claims V(A) and V(B) in McWhorter’s amended Rule 32 petition.) As to Claim V(A), McWhorter asserts that he proved at the postconviction evidentiary hearing that Juror L.B. failed to disclose material information about herself during jury selection and that her failure to so disclose prejudiced him. (McWhorter’s brief, p. 25.) Regarding Claim V(B), he alleges that it was sufficiently pleaded and meritorious on its face and thus entitled him to a postconviction evidentiary hearing. (McWhorter’s brief, p. 38.)
This Court has articulated the following in reviewing juror-misconduct claims:
“ ‘In [Ex parte ] Dobyne, [805 So.2d 763 (Ala.2001),] this Court explained the standard for granting a new trial based on a juror’s failure to answer questions on voir dire truthfully:
“ ‘ “The proper standard for determining whether juror misconduct warrants a new trial, as set out by this Court’s precedent, is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant. See Ex parte Stewart, 659 So.2d 122 (Ala.1993).... The ‘might-have-been-prejudiced’ standard, of course, casts a ‘lighter’ burden on the defendant than the actual-prejudice standard. See Tomlin v. State, su *1211 pra, 695 So.2d [157] 170 [ (Ala.Crim.App.1996) ]....
“ ‘ “It is true that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely.... However, not every failure to respond properly to questions propounded during voir dire ‘automatically entitles [the defendant] to a new trial or reversal of the cause on appeal.’ Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330, 335 (1970).... As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is ‘whether the defendant might have been prejudiced by a veniremember’s failure to make a proper response.’ Ex parte Stewart, 659 So.2d at 124. Further, the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court’s discretion....
“ ‘ “ ‘The determination of whether the complaining party was prejudiced by a juror’s failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has abused its discretion. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: “temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror’s inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.’”
“ ‘ “Union Mortgage Co. v. Barlow, 595 So.2d [1335] at 1342-43 [ (Ala.1992)]....
“ ‘ “The form of prejudice that would entitle a party to relief for a juror’s nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror. Ex parte Ledbetter, 404 So.2d 731 (Ala.1981).... If the party establishes that the juror’s disclosure of the truth would have caused the party either to (successfully) challenge the juror for cause or to exercise a peremptory challenge to strike the juror, then the party has made a prima facie showing of prejudice. Id. Such prejudice can be established by the obvious tendency of the true facts to bias the juror, as in Ledbetter, supra, or by direct testimony of trial counsel that the true facts would have prompted a challenge against the juror, as in State v. Freeman, 605 So.2d 1258 (Ala.Crim.App.1992).”
‘“Dobyne, 805 So.2d at 771-73 (footnote omitted; emphasis added).’
“Dixon [v. State, 55 So.3d 1257, 1260-61 (Ala.2010) ].
“ “While we agree ... that a juror’s silence during voir dire could be a basis for granting a new trial, we must stress that the initial decision on this issue is within the trial court’s sound discretion. Hayes v. Boykin, 271 Ala. 588, 126 So.2d 91 (1960). Further, the trial court’s decision on this matter will not be disturbed on appeal unless the appellant establishes that the decision was arbitrarily entered into or was clearly erroneous. Id:
*1212 “Carter v. Henderson, 598 So.2d 1350, 1354 (Ala.1992). ‘[N]ot every failure of a venireman to respond correctly to a voir dire question will entitle the losing party to a new trial.’ Wallace v. Campbell, 475 So.2d 521, 522 (Ala.1985).
“ ‘It is not “any failure of any prospective juror to respond properly to any question regardless of the excuse or circumstances [that] automatically entitles a party to new trial or reversal of the cause on appeal.” Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330 (1970) (emphasis in original).’
“Washington v. State, 539 So.2d 1089, 1095 (Ala.Crim.App.1988). ‘[T]he facts in each case must be considered individually and much will remain in the discretion of the trial judge.’ Parish v. State, 480 So.2d 29, 32 (Ala.Crim.App.1985).”
Albarran v. State, 96 So.3d 131, 195 (Ala.Crim.App.2011).
In light of the foregoing, we address McWhorter’s allegations of juror misconduct separately.
A.
McWhorter first argues that the circuit court abused its discretion in denying his claim that Juror L.B. committed juror misconduct because she did not disclose the story of her father’s death when defense counsel asked the members of the venire on a juror questionnaire and during voir dire if anyone had a family member who had been the victim of a crime. He claims that the misconduct denied him the ability to use his peremptory strikes effectively and to make any challenges for cause. The State responds that McWhorter failed to establish that Juror L.B.’s father had been the victim of a crime or that L.B. believed that her father was a victim of a crime.
McWhorter pleaded in his amended Rule 32 petition that Juror L.B.’s father had been the victim of a crime. In his amended petition, McWhorter specifically alleged:
“61. During voir dire, several jurors failed to answer accurately defense counsel’s direct and unambiguous questions, both oral and written. This failure deprived Mr. McWhorter of the effective use of his right to strike a petit jury from a panel of fair-minded, impartial prospective jurors; his right to have questions answered truthfully by prospective jurors so that his counsel could exercise peremptory strikes and challenge jurors for cause; and his rights to due process, a fair trial, and a reliable sentencing, all protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law.
“62. A defendant is entitled to receive truthful and accurate answers from jurors during voir dire, and when a juror fails to respond accurately during voir dire, reversible error occurs. The Sixth Amendment guarantees a criminal defendant a fair trial by a panel of impartial jurors. Irvin v. Dowd, 366 U.S. 717, 722 (1961). This right is violated and a new trial is required when a juror deliberately deceives the court about a matter which, if fully explored, would constitute a valid basis for a challenge for cause against that juror. McDonough Power Equipment v. Greenwood, 464 U.S. 548, 556 (1984). See also Clark v. State, 551 So.2d 1091 (Ala.1989) (where juror failed to disclose that he had served on a previous case, reversible error occurred); Ex parte Ledbetter, 404 So.2d 731 (Ala.1981); Tomlin v. State, 695 So.2d 157 (Ala.Crim.App.1996) (new trial required when juror failed to disclose on voir dire that he had been a *1213 victim of crime); Abercrombie v. State, 574 So.2d 879 (Ala.Crim.App.1990) (where juror did not disclose that she had an interest in the conviction of the defendant, probable prejudice was shown, and the conviction had to be reversed); State v. Gilbert, 568 So.2d 876 (Ala.Crim.App.1990) (where juror did not disclose that she knew someone who had been sexually abused, and evidence was presented at a Rule 20 hearing [the precursor to Rule 32] that the juror did, in fact, know someone who had been sexually abused, the conviction and sentence had to be reversed).
“63. One particular juror, [hereafter L.B.], failed to disclose that her father was murdered when she was twelve. She withheld this information in spite of defense counsel’s] questions on the juror questionnaire and on individual voir dire designed specifically to elicit such information. Question 21 of the jury questionnaire asked, ‘Have you, any member of your family or anyone you know ever been the victim of a crime?’ (Supp. R. 55) (emphasis added) The questionnaire went on to ask, ‘If yes, who and what relationship?,’ ‘What was the crime?,’ Was anyone arrested in connection with the crime?,’ and Was anyone convicted of the crime?’ (Id.) L.B. answered the first question ‘yes,’ but she went on to state that the supposed ‘victim’ was her ‘brother-in-law,’ the crime was ‘drugs,’ and that someone had been arrested and convicted. (Id.) Question 22 of the questionnaire asked, ‘Have you, any member of your family or anyone you know ever been accused of a crime’ (Id.) Juror L.B. answered that her ‘brother-in-law' had been accused of ‘drugs’ eighteen months ago, was prosecuted in Marshall County, and “was on probation.’ (Id.) (emphasis added) In essence, Juror L.B. gave identical answers to the ‘crime victim’ question and the ‘accused of a crime’ question. The additional information provided by Juror L.B. in her answer to Question 22 would lead a reasonable reader to infer that Juror L.B.’s brother-in-law was not, in fact, a crime victim, but a person who had been accused of, and prosecuted for, a drug-related crime.
“64. Juror L.B. wrote in response to Question 20 that she thought her father-in-law might have appeared as a witness in the ‘Kathy Padgitt [sic]’ case. (Id.) Kathy Padgett was the victim in a highly publicized capital murder trial that occurred in Marshall County only two years before Mr. McWhorter’s trial. Juror L.B.’s answer to Question 20 suggested that she knew Kathy Padgett, a fact that she failed to disclose in Question 21.
“65. The record reflects that defense counsel had serious concerns about Juror L.B.’s contradictory and confusing answers, and they tried hard to clarify whether Juror L.B. had any close connection to a person who had been a victim of a crime. Defense counsel specifically requested, and the trial judge granted, individual follow-up questioning of Juror L.B. (R. 414) First, defense counsel asked questions to confirm, and did confirm, that Juror L.B.’s brother-in-law had been convicted of a crime (and was not a crime victim), and that the conviction would not affect her ability to be a fair and impartial juror in this case. (R. 415) Second, defense counsel inquired as to the extent of Juror L.B.’s relationship with Kathy Padgett. (R. 417) In answer to defense counsel’s question, Juror L.B. stated, T had just moved up here. And I — did not know her that well. I knew her just by being in the church and that’s — that’s all I knew about her.’ (Id.) Defense counsel *1214 did not stop his questioning there, but went on to confirm that Juror L.B.’s connection to Kathy Padgett was ‘strictly some slight knowledge’ that would not ‘make it difficult at all’ for her to be impartial if she were chosen as a juror. (R. 417-18)
“66. Defense counsel had no way to obtain through independent means the information that Juror L.B.’s father was a murder victim. Had Mr. McWhorter known this fact, he would have challenged Juror L.B., for cause, as he did prospective juror V.W., who was excused for cause because his nephew was killed during an armed robbery. (R. 885, 892) Defense counsel also challenged and removed six other jurors who had connections to victims of crime. (R. 743, 744, . 752, 881-82, 888-89, 894, 906-07; Supp. R. 106, 115, 118, 184, 205, 208) Because of Juror L.B.’s experience as the daughter of a murder victim, Mr. McWhorter was entitled to strike her for cause. And if she were not excused for cause, Mr. McWhorter would have used a peremptory strike to remove her, had he been accurately advised of her history.
“67. Juror L.B.’s failure to disclose that her father was murdered denied Mr. McWhorter his right to free exercise of his peremptory challenges. In addition, Juror L.B.’s presence on the jury deprived Mr. McWhorter of his rights to due process, adequate voir dire, and a fair and impartial jury under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law.”
(C. 494-97.)
The circuit court conducted a postconviction evidentiary hearing and allowed McWhorter to present evidence of this claim. Juror L.B. testified that she did not share the details of her fathér’s death on the juror questionnaire or during voir dire examination because she did not really know how her father died. A friend, who was a law student, had investigated Juror L.B.’s father’s death before her jury service and had discovered that her father had died in an accidental drowning. Juror L.B. explained that because no one was ever charged with a crime related to her father’s death, much less convicted, that she did not consider her father “the victim of a crime” and, therefore, did not tell the story of her father’s death when asked on the juror questionnaire and during voir dire whether a family member had been “the victim of a crime.” At the evidentiary hearing, Juror L.B. testified, in pertinent part, as follows:
“[POSTCONVICTION COUNSEL:] [Juror L.B.], once again, could you tell us what happened to your father, and could you indicate, you know, what, if anything, is based on things you saw and what is based on what you heard?
“[JUROR L.B.:] Okay. My mother and my two brothers and I were woke up one morning about 2:00 o’clock in the morning.
“This is still hard for me.
“[POSTCONVICTION COUNSEL:] I understand.
“[JUROR L.B.:] And we was told that my father and two other men were at a rock mine pond. And my mother went and got my uncle up, which was my daddy’s brother. And he took us up there. And they would not let us go down there.
“And about 11:00 o’clock that morning, a police officer came to our house and told us that they were fixing to blow the dam, and that they believed that my father was — had run. There was another man that was killed there that day. He was beat to death.
*1215 “Ajad so they told us that they were going to send a diver down one more time and if they didn’t find anything then they were going to blow the dam. When they sent a diver down, they found my father. And he was dead, naturally.
“We were told that there were bruises around his neck, but when the autopsy came back it was said that he was drowned. The other man was beaten to death. And there was a trial. The other man that was there, he went and got the — his family and then went to the police station and got them and brought them back. Or they went out to the scene is all I know.
“I had just always thought that my father was killed because the other man was killed, and he was good friends with him, so I thought that he had been killed. And being a kid you always think that. You don’t ever know. And so that’s why I always thought my father was killed.
“[POSTCONVICTION COUNSEL:] Now, you said that someone told you that your father had bruises on his neck. Who told you that?
“[JUROR L.B.:] My uncles. My daddy’s brothers.
“[POSTCONVICTION COUNSEL:] Now, at the time, you were about 12 years old, right?
“[JUROR L.B.:] Yes.
[[Image here]]
“[POSTCONVICTION COUNSEL:] Your memories of what happened to your father were and still are traumatic, something that’s hard for you to talk about, isn’t it?
“[JUROR L.B.:] Yes.
“[POSTCONVICTION COUNSEL:] And isn’t it true that at some point along the way you have got emotional closure when someone told you that he worked on the case, and even though he couldn’t get enough evidence to prove your father was murdered, that having worked on the case he did believe it?
“[JUROR L.B.:] Believe that my father was murdered or that he drowned?
“[POSTCONVICTION COUNSEL:] That your father was murdered?
“[JUROR L.B.:] No. You got it backwards.
“[POSTCONVICTION COUNSEL:] Okay. Well, you were — at the time that you — in 1994, at the time that you served on the jury in Casey McWhorter’s case, did you believe that your father had been murdered?
“[JUROR L.B.:] No.
“[POSTCONVICTION COUNSEL:] You did not?
“[JUROR L.B.:] No.
“[POSTCONVICTION COUNSEL:] What was it, if anything, that happened between the time you were at trial, when you say you did [sic] believe he was murdered, and the time of Casey McWhorter’s trial that led you to change your mind?
“[JUROR L.B.:] I dated a guy that was going to law school, and he looked into the case of my father, and he told me that my father had drowned; that the autopsy had showed that my father had drowned.
“[POSTCONVICTION COUNSEL:] Yes. And did he explain that because the autopsy showed that your father had drowned they were unable to prove that he had been murdered?
“[JUROR L.B.:] No.
“[POSTCONVICTION COUNSEL:] And isn’t it true that the man we’re talking about, the lawyer, said that because the autopsy couldn’t prove the murder because it said drowned, that he *1216 still believed, based on all the evidence he knew about, that it was a murder?
“[JUROR L.B.:] No.”
(R. 46-48, 52-54.)
On cross-examination, Juror L.B. testified:
“[STATE:] And do you remember that Question Number 21 he showed you, the question that says, ‘[W]ere you or anybody in your family a victim of a crime’?
“[JUROR L.B.:] Uh-huh. Right.
“[STATE:] And you did not answer that your father was a victim of a crime, right?
“[JUROR L.B.:] Right. Did not.
“[STATE:] Is it fair to say that you did not answer that your father was a victim of a crime because no one, in fact, had been charged with a crime in the death of your father?
“[JUROR L.B.:] That’s right.
“[STATE:] And no one had ever been convicted in the death of your father, correct?
“[JUROR L.B.:] That’s right.
“[STATE:] And you had personal knowledge that the autopsy officially said that he drowned?
“[JUROR L.B.:] Right.
“[STATE:] And that there was no indication other than what you had just heard through family rumors that he actually had been murdered?
“[JUROR L.B.:] Yes.
“[STATE:] So far as you were concerned, you were being completely honest and truthful when you answered that question?
“[JUROR L.B.:] Yes, I was.
[[Image here]]
“[STATE:] Just to be clear, [Juror L.B.], you did not deliberately hide the story of your father’s death when you were answering the jury questionnaire?
“[JUROR L.B.:] No.
“[STATE:] The way the question was worded on the jury questionnaire was, were you or any of your family members the victim of a crime, not just a victim?
“[JUROR L.B.:] Right, yes.
“[STATE:] And that there must have— without a criminal charge, without a criminal conviction, even, that you cannot have a family member who was a victim of a crime?
“[JUROR L.B.:] Yes.”
(R. 116-17; 123-24.)
In addition, Juror L.B. testified to the following at the postconviction proceeding:
“[POSTCONVICTION COUNSEL:] Did you — but you believed, after hearing what everything that you heard about the incident, that your father had been killed, didn’t you?
“[JUROR L.B.:] Yes.
[[Image here]]
“[JUROR L.B.:] Okay. Is because I had always been told as a child that my father was killed by his family because they were the big bad boys, okay? And I’d always believed that. You know, because you don’t think of your father as drowning. You just don’t think of that. And I just always thought that my father was killed.
I knew the man, and I knew his family, and I just thought that if he killed one, he’d kill both.
“[POSTCONVICTION COUNSEL:] And is that what you thought in 1994 at the time that you served on the jury?
“[JUROR L.B.:] I still believed that the man had something to do with my father’s death. Whether he directly killed him or not, I do not know. Only God knows that. But I think he had something indirectly to do with it, yes.
*1217 “[POSTCONVICTION COUNSEL:] You do. And was that a strong feeling on your part?
“[JUROR L.B.:] Yes.
[[Image here]]
“[POSTCONVICTION COUNSEL:] [Juror L.B.], can you tell us what you said to your fellow jurors regarding the death of your father?
“[JUROR L.B.:] That the man that had killed my father — I thought that had killed my father and another man did not serve the full time that he was in there. I don’t even know how many years that he gave him. I thought it was ten and he only served like three or four and that he should have served more.
[[Image here]]
“[JUROR L.B.]: No. I didn’t think he had killed my father. I think he had something to do with the death of my father. Whether or not he individually killed him, I do not know.
“[POSTCONVICTION COUNSEL:] Well, did you believe that he, together with someone else, played a part in the killing?
“[JUROR L.B.:] Well, when you say killing, the other man was killed. My father was drowned. Now, whether or not he was drowned on purpose, I do not know.
“[POSTCONVICTION COUNSEL.:] Did you—
“[JUROR L.B.:] But I do know that he did play a part in the other death because he told him he did. He pled guilty to the other death.
“[POSTCONVICTION COUNSEL:] And did you believe at that time that there was that it’s quite possible that your father had been intentionally drowned?
“[JUROR L.B.:] Yes. He could have been.
“[POSTCONVICTION COUNSEL:] And that was your belief at that time in 1994?
“[JUROR L.B.:] Well, that’s been my belief all my life.
“[POSTCONVICTION COUNSEL:] So you believed it all your life and up through and including the trial?
“[JUROR L.B.:] Yeah.”
(R. 51, 60,112,113.)
Additionally, Juror A.S., who was known as Juror A.K. at the time of trial, testified, and the following exchange occurred:
“[POSTCONVICTION COUNSEL:] During the deliberations on the sentencing phase was there something that [Juror L.B.] said about her father or other relative being murdered?
“[JUROR A.S.:] Yes.
“[POSTCONVICTION COUNSEL:]
What did she say?
[[Image here]]
“THE COURT: Let me help just a little bit. We really just want to know exactly what the juror told about her father.
“[JUROR A.S.]: [Juror L.B.] was standing, and she started telling a story about how years before — I’m not exactly sure how long before, but years before, her father had been murdered, and that, to my best recollection, he wasn’t — I’m not sure if he went to jail or he didn’t go to jail, but she now had to walk around in the same town where this man was that killed her father. And she was crying.
“[STATE]: Objection, Your Honor. It is going beyond the scope of your question at this point.
“THE COURT: It probably is, but I do think it’s relevant for that purpose.
*1218 “[POSTCONVICTION COUNSEL:] And did she say anything else on this very same subject?
“[JUROR A.S.:] She had made a comment that, basically, you just don’t know how it feels to have to walk around and be around this person that has done this.
“[POSTCONVICTION COUNSEL:] Referring to whom?
“[JUROR A.S.:] Referring to the person that had killed her father. And it just changed everything.
“[POSTCONVICTION COUNSEL:] Thank you very much. Nothing further.
“[STATE]: Move to strike the statement that it changed everything. That’s speculation.
“[POSTCONVICTION COUNSEL]: I don’t believe the witness was talking about changed the jury deliberations. I believe she was talking about [Juror L.B.] said it changed everything in her life.
“THE COURT: That was the way I took it.
“[STATE]: Okay.
“THE COURT: I will not consider it that it changed the jury’s opinion of her.
“[POSTCONVICTION COUNSEL]: Okay. Nothing further.”
(R. 465-67.)
After lengthy testimony at the hearing, the circuit court held, in a detailed order, that McWhorter failed to meet his burden to prove by a preponderance of the evidence at the hearing that Juror L.B. believed that her father was the victim of a crime and that she did not disclose that belief. See Rule 32.3, Ala. R.Crim. P. The circuit court, in its detailed order denying McWhorter’s claim, referenced Juror L.B.’s testimony on both direct and cross-examination. Specifically, the circuit court found:
“She explained that she did not know how her father died. It was apparent from [Juror L.B.’s] testimony why she did not answer in the affirmative when asked whether she had a family member who had been the ‘victim of a crime.’ [Juror L.B.] testified that a friend, a law student, investigated the death and found an autopsy report that attributed her father’s death to drowning, and she testified that, because no one ever was charged with a crime related to her father’s death, much less convicted of one, that her father could not have been ‘the victim of a crime.’
[[Image here]]
“Because [Juror L.B.] knew that her father’s autopsy report indicated that he died by drowning and because she knew that no one ever had been charged with any crime related to her father’s death, she reasonably did not disclose the story of her father’s death in response to the defense’s question of whether she or a member of her family had been the ‘victim of a crime.’ Thus, [Juror L.B.] did not commit juror misconduct.”
(C. 1130,1136.)
The record on direct appeal reveals that Juror L.B. did not indicate on her juror questionnaire or during voir dire that her father was a victim of a crime. She, however, indicated at all times when she was questioned at trial that she could be fair and impartial. At the postconviction evidentiary hearing, postconviction counsel questioned Juror L.B. extensively about her father’s death. Although at times Juror L.B. appeared to waver in her responses to postconviction counsel’s questioning or seemed confused about his questioning, as we indicated above, we cannot say that Juror L.B. failed to respond truthfully to the question posed on the juror questionnaire and by McWhorter’s trial counsel during voir dire examination, especially in *1219 light of Juror L.B.’s testimony on cross-examination that established that she knew her father’s death was the result of a drowning and that she did not believe he was a victim of a crime. Thus, based on these facts, this Court cannot conclude that the circuit court abused its discretion in denying McWhorter’s claim because he failed to prove by a preponderance of the evidence that Juror L.B. was guilty of juror misconduct. See Rule 32.3, Ala. R.Crim. P. Furthermore, in regard to resolution of factual issues and the assessment of the credibility of witnesses, this Court has explained:
“ ‘The resolution of ... factual issue[s] required the trial judge to weigh the credibility of the witnesses. His determination is entitled to great weight on appeal.... “When there is conflicting testimony as to a factual matter ..., the question of the credibility of the witnesses is within the sound discretion of the trier of fact. His factual determinations are entitled to great weight and will not be disturbed unless clearly contrary to the evidence.” ’
“Calhoun v. State, 460 So.2d 268, 269-70 (Ala.Crim.App.1984) (quoting State v. Kiar, 400 So.2d 610, 613 (La.1981)).”
Brooks v. State, 929 So.2d 491, 495-96 (Ala.Crim.App.2005).
Therefore, because it is for the circuit court at the postconviction proceeding to resolve factual issues and to assess the credibility of the witnesses and because this Court gives the circuit court’s determination in that assessment great weight on appeal, we conclude there is no indication that the circuit court abused its discretion in denying McWhorter relief on his claim related to Juror L.B.’s answers on her juror questionnaire and during voir dire examination. See, e.g., Dunaway v. State, [Ms. CR-06-0996, Dec. 18, 2009] — So.3d —, — (Ala.Crim.App.2009) (granting no relief on capital-murder post-conviction claims involving juror misconduct because the petitioner failed to meet his burden); Hooks v. State, 21 So.3d 772, 780-81 (Ala.Crim.App.2008) (same).[9]
Furthermore, the circuit court could have denied relief on this claim because McWhorter failed to establish prejudice. To prevail on a claim of juror misconduct, the petitioner must establish that he “might have been prejudiced” by the jurors’ failure to respond truthfully to a question posed on voir dire. See Ex parte Stewart, 659 So.2d 122,124 (Ala.1993).
“ ‘We are mindful of the heavy responsibility placed on the trial court to maintain the statutory right which parties have to a full and truthful disclosure by jurors on voir dire. However, we must also be aware of inadvertent concealment and failure to *1220 recollect on the part of prospective jurors.’
“Freeman v. Hall, 286 Ala. 161, 167, 238 So.2d 330, 336 (1970).”
Albarran, 96 So.3d at 196.
Additionally, as this Court noted in Smith v. State, 838 So.2d 413, 468-69 (Ala.Crim.App.2002), regarding the interests a court must balance when determining whether a juror’s failure to disclose material information during voir dire prejudiced a defendant:
“ ‘[T]he problem of jurors failing to disclose material information during voir dire is neither a recent development nor an unusual occurrence. In 1965 Dale Broeder published his seminal study on juror dishonesty during voir dire. The article included many case studies detailing why jurors fail to respond honestly during voir dire. For some jurors, the questions seemed too trivial to merit an honest response. Other jurors were simply too nervous to volunteer information during voir dire. For still others, the desire to serve outweighed the desire to tell the truth. One particular juror viewed selection as an honor and intended to use his jury experiences as a subject of barroom conversation. More recent research indicates that approximately twenty-five percent of jurors fail to reveal material information during voir dire.
“ ‘Given the high frequency with which jurors fail to disclose material information, it should come as no surprise that a showing of juror dishonesty, made after the trial, does not necessarily lead to the granting of a new trial. As Professor David Crump has noted, courts must balance two strong and competing interests: fairness and finality. In the criminal context, fairness means the right to impartial jurors, the right to the intelligent use of peremptory strikes, and the right to be free from juror misconduct. Courts will consider some combination of these rights in deciding whether to grant a new trial.’
“When Jurors Lie: Differing Standards for New Trials, 22 Am. J.Crim. L. 733, 734-35 (1995) (footnotes omitted).”
838 So.2d at 439.
Specifically, as to alleged prejudice, the circuit court found as follows:
“Even if [Juror L.BJ’s failure to disclose the story of her father’s death constitutes juror misconduct, McWhorter has failed to establish prejudice. This claim is denied, in the alternative, for that reason.
“Under Alabama law, the standard for determining whether juror misconduct warrants a new trial is ‘whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant.’ Ex parte Dobyne, 805 So.2d 763, 771 (Ala.2001). ‘[T]he question whether the jury’s decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case.’ Ex parte Apicella, 809 So.2d 865, 871 (Ala.2001) (emphasis in original).
“In determining whether a criminal defendant might have been prejudiced by a veniremember’s failure to respond appropriately to a question, the Supreme Court of Alabama and the Alabama Court of Criminal Appeals have looked at the following factors: ‘temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror’s inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.’ Dobyne, 805 *1221 So.2d at 772; Tomlin v. State, 695 So.2d 157,170 (Ala.Crim.App.1996).
“[Juror L.B.] was unequivocal that her father’s death did not affect her role as a juror in McWhorter’s capital murder trial. The following testimony occurred during the State’s cross-examination of [Juror L.B.]:
' “ASSISTANT ATTORNEY GENERAL: [Juror L.B.], is it fair to say that when — that when you voted for guilty for Mr. McWhorter you based that on the evidence at trial?
“[JUROR L.B.]: Yes.
“ASSISTANT ATTORNEY GENERAL: And when you voted for death, you based that on the evidence presented during the guilt phase?
“[JUROR L.B.]: Yes, sir, I did.
“This Court believes [Juror L.BJ; therefore. McWhorter cannot show that [Juror L.B.j’s decisions as a juror ‘might have been affected’ by her father’s death.
“Looking to the factors listed in Do-byne, [Juror L.B.j’s role as a juror likely was not affected by her father’s death. First, as to ‘temporal remoteness,’ [Juror L.B.j was an 11-year-old child when her father died, but McWhorter’s trial did not take place until she was an adult, approximately 30 years later. (E.H. 77, 118.) Second, as for ‘the ambiguity of the question propounded,’ the question itself was straightforward enough, but [Juror L.B.j’s lack of certainty over how her father died made the story of his death less likely to have affected her role as a juror. Third, as to [Juror L.B.j’s ‘inadvertence or willfulness in falsifying or failing to answer,’ she affirmed that her father was not ‘at all in her mind’ when she answered the questionnaire and that she ‘did not have an ax to grind’ or want to ‘vindicate the death of her father through this trial.’ (E.H. 116,119.)
“[Juror L.B.j’s testimony during the evidentiary hearing establishes not only that she did not commit juror misconduct by failing to respond appropriately to questions asked by defense counsel during voir dire but also that she based her decisions as a juror in this case solely on the facts presented, and not at all on her father’s death. As such, this claim is denied.”
(C. 1136-39; emphasis added.)
Here, Juror L.B. testified at the evidentiary hearing that she based her verdict on the testimony presented and on the trial court’s instructions. More importantly, she said that the events surrounding her father’s death had no bearing on her guilt-phase or penalty-phase verdict in McWhorter’s case. We, like the circuit court, find no indication that McWhorter might have been prejudiced by Juror L.B.’s failure to respond that her father was a victim of a crime on the juror questionnaire or to a voir dire question. Accordingly, McWhorter is due no relief on this claim.
B.
Secondly, McWhorter argues that the circuit court erred in summarily dismissing claim V(B) of his amended petition in which he alleged that the jury considered “extraneous evidence” during deliberations. He asserts that the circuit court exceeded its discretion because, he says, his claim could not have been raised at trial or on appeal and was not proeedurally barred. Thus, he says, the circuit court summarily dismissed his claim for the wrong reason pursuant to Rule 32.2(a)(3) and (5), Ala. R.Crim. P. Alternatively, he claims that Juror L.B.’s information about her fathers’s death was “extraneous evidence” and that the circuit court erred in *1222 denying claim V(B) by alternatively concluding that his claim failed to raise a material issue of fact or law pursuant to Rule 32.7(d), Ala. R.Crim. P. The State responds that claim V(B) of McWhorter’s petition failed to state a material issue of fact or law because, it says, McWhorter “failed to plead admissible evidence or evidence that, if true, would establish that he suffered prejudice.”
The circuit court, Judge Evans, originally summarily dismissed McWhorter’s claim on alternate grounds because it could have been, but was not, raised at trial or on direct appeal and because it failed to raise a material issue of fact or law. See Rule 32.2(a)(3), (a)(5), and 32.7(d). Although Judge Burke reiterated Judge Evans’s summary-dismissal grounds in his final order, he also found that Juror L.B.’s story of the circumstances surrounding her father’s death was not “extraneous evidence” under Alabama law. In appears that, in essence, the circuit court dismissed the claim but also ruled on the merits, given the testimony it considered on McWhorter’s claim V(A).
Specifically, Judge Burke’s order found as follows:
“Judge Evans’s order of October 19, 2006, alternatively dismissed this claim because it failed to state a material issue of fact or law, in violation of Rule 32.7(d) of the Alabama Rules of Criminal Procedure. Judge Evans’s order did not specify why this claim failed to meet the requirements of Rule 32.7(d). However, this Court finds that McWhorter was permitted to introduce testimony from Juror [L.B.] in support of Claim V(A) at the evidentiary hearing. Both this claim and Claim V(A) are based on the same so-called extraneous evidence: Juror [L.B.J’s story of the circumstances surrounding her father’s death. But Juror [L.B.j’s story was not extraneous evidence under Alabama law. See Ex parte Arthur, 835 So.2d 981, 984, n. 2 (Ala.2002) (quoting Sharrief v. Gerlach, 798 So.2d 646, 653 (Ala.2001)) (‘An extraneous fact is one “obtained by the jury or introduced to it by some process outside the scope of the trial.” ’); see also, Bethea v. Springhill Memorial Hosp., 833 So.2d 1, 8 (Ala.2002) (holding that the discussions between jurors about personal experiences or knowledge, such as occurred in this case, do not constitute ‘extraneous evidence’ and, thus, are inadmissible under Rule 606(b) of the Alabama Rules of Evidence.). As such, this claim raises no material issue of fact or law and therefore was dismissed correctly by Judge Evans under Rule 32.7(d).”
(C. 1124-25.)
In this case, the circuit court alternatively dismissed McWhorter’s juror-misconduct claim (claim V(B)) on the basis that it raised no material issue of fact or law. See Rule 32.7(d). This Court, when reviewing a circuit court’s rulings on a post-conviction petition, may affirm the ruling if it is correct for any reason. Lee, 44 So.3d at 1149.
It is well settled that “matters that the jurors bring up in their deliberations are simply not improper under Alabama law, because the law protects debates and discussions of jurors and statements they make while deliberating their decision.” Sharrief v. Gerlach, 798 So.2d 646, 653 (Ala.2001). “Rule 606(b), Ala. R. Evid., recognizes the important ‘distinction, under Alabama law, between “extraneous facts,” the consideration of which by a jury or jurors may be sufficient to impeach a verdict, and the “debates and discussions of the jury,” which are protected from inquiry.’” Jackson v. State, 133 So.3d 420, 431 (Ala.Crim.App. *1223 2009) (quoting Sharrief, 798 So.2d at 652). “[T]he debates and discussions of the jury, without regard to their propriety or lack thereof, are not extraneous facts.” Sharrief 798 So.2d at 653. Thus, “affidavit[s or testimony] showing that extraneous facts influenced the jury’s deliberations [are] admissible; however, affidavits concerning ‘the debates and discussions of the case by the jury while deliberating thereon’ do not fall within this exception.” CSX Transp., Inc. v. Dansby, 659 So.2d 35, 41 (Ala.1995) (quoting Alabama Power Co. v. Turner, 575 So.2d 551, 557 (Ala.1991)).
In terms of this claim of juror misconduct, the statements allegedly made by Juror L.B. and the impact those statements may have had on the jury in its deliberations are not extraneous facts. Juror L.B.’s story about her father does not qualify under the exception for “extraneous information.” See Rule 606(b), Ala. R. Evid.[10] But see Taite v. State, 48 So.3d 1 (Ala.Crim.App.2009).[11] Therefore, it is insulated from inquiry and cannot form the basis of a valid claim for postconviction relief under Rule 32.
As this Court stated in addressing a similar issue in Jones v. State, 753 So.2d 1174 (Ala.Crim.App.1999):
“[W]e reject Jones’s claim that his ‘death sentence was the result of coercive influences brought into the jury deliberations which were outside the scope of the evidence and judicial control.’ (Appellant’s brief at p. 97.) Specifically, he argues that a juror’s statement that ‘if we give him life that maybe in a few years that he would be up for parole’ improperly persuaded others to sentence him to death. (R. 275-76.)
“Testimony at the Rule 32 hearing indicated that before reaching its 12-0 advisory verdict recommending a sentence of death, the jury voted several times. Several ballots resulted in a 10-2 determination to recommend death. One of the two individuals who initially voted against death testified that she changed her vote in favor of death after J.M. made the statement regarding parole.
“ ‘A juror cannot impeach his verdict by later explaining why or how the juror arrived at his or her decision.’ Adair v. State, 641 So.2d 309, 313 (Ala.Cr.App.1993).
“Moreover, Rule 606(b), Ala. R. Evid., provides, in pertinent part:
“ ‘Upon an inquiry into the validity of a verdict or indictment, a juror may *1224 not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury’s deliberations or the effect of anything upon that or any other juror’s mind or emotions as influencing the juror as to assent to or dissent from the verdict or indictment or concerning the juror’s mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror’s affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.’
“We find no merit to Jones’s claim because it was based on prohibited testimony. A consideration of the claim would destroy the integrity of the jury system, encourage the introduction of unduly influenced juror testimony after trial, and discourage jurors from freely deliberating, and inhibit their reaching a verdict without fear of post-trial harassment, publicity, or scrutiny. See Ex parte Neal, 731 So.2d 621 (Ala.1999); and Barbour v. State, 673 So.2d 461, 469-70 (Ala.Cr.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996).”
753 So.2d at 1203-04 (footnote omitted). Similarly, here, a consideration of this claim of juror misconduct — which is based entirely on the debate and deliberations of the jury — “would destroy the integrity of the jury system, encourage the introduction of unduly influenced juror testimony after trial, and discourage jurors from freely deliberating, and inhibit their reaching a verdict without fear of post-trial harassment, publicity, or scrutiny.” Jones, 753 So.2d at 1204. Therefore, this claim fails to state a material issue of fact or law upon which relief could be granted, and dismissal was proper under Rule 32.7(d).
Further, McWhorter did not meet his burden of pleading as required by Rules 32.3 and 32.6(b). Instead, he alleged only that Juror L.B.’s story during deliberations changed several jurors’ votes but failed to allege which jurors changed their votes, what their votes were before hearing Juror L.B.’s story, or whether the story had anything to do with their changing their vote.[12] Thus, we find no error in the circuit court’s denial of this claim.
We also feel compelled to address a claim McWhorter presents in his brief and in his reply to this Court in a two-sentence argument. McWhorter argues that “it was apparent that [the circuit court] *1225 adopted the State’s proposed findings of fact, almost verbatim ... only five phrases differed in any way from the State’s proposed order.” (McWhorter’s brief, p. 18.) He appears to argue that the circuit court erred in adopting, with only minor modifications, the State’s proposed order denying his Rule 82 petition. Specifically, in his reply, McWhorter asserts that because the circuit court’s order was “largely a wholesale adoption of the State’s proposed findings of facts and conclusions of law” it was not entitled to deference on the juror-misconduct claim. (McWhorter’s reply, p. 9.)
Both McWhorter and the State submitted proposed orders. Shortly thereafter, the circuit court entered an order denying McWhorter’s postconviction petition, adopting the State’s previously submitted proposed order, with only minor modifications. McWhorter filed an objection on the grounds that the circuit court had adopted the State’s proposed order, which the circuit court overruled by notation on the case action summary.
This Court recently addressed a similar claim in Miller v. State, 99 So.3d 349 (Ala.Crim.App.2011), in which this Court set out the development of the caselaw in regard to the adoption of proposed orders:
“ ‘ “While the practice of adopting the state’s proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Hubbard v. State, 584 So.2d 895 (Ala.Cr.App.1991); Weeks v. State, 568 So.2d 864 (Ala.Cr.App.1989), cert. denied, [498] U.S. [882], 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990); Morrison v. State, 551 So.2d 435 (Ala.Cr.App.), cert. denied, 495 U.S. 911,110 S.Ct. 1938,109 L.Ed.2d 301 (1990).”
‘“Bell v. State, 593 So.2d 123, 126 (Ala.Crim.App.1991). See also Dobyne v. State, 805 So.2d 733, 741 (Ala.Crim.App.2000); Jones v. State, 753 So.2d 1174, 1180 (Ala.Crim.App.1999).
“ ‘More recently in Hyde v. State, 950 So.2d 344 (Ala.Crim.App.2006), we stated:
“‘“[T]his Court has repeatedly upheld the practice of adopting the State’s proposed order when denying a Rule 32 petition for postconviction relief. See, e.g., Coral v. State, 900 So.2d 1274, 1288 (Ala.Crim.App.2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005), and the cases cited therein. ‘Alabama courts have consistently held that even when a trial court adopts verbatim a party’s proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.’ McGahee v. State, 885 So.2d 191, 229-30 (Ala.Crim.App.2003).”
“ ‘950 So.2d at 371.
“ ‘However, the Alabama Supreme Court has admonished that “appellate courts must be careful to evaluate a claim that a prepared order drafted by the prevailing party and adopted by the trial court verbatim does not reflect the independent and impartial findings and conclusions of the trial court.” Ex parte Ingram, 51 So.3d 1119,1124 (Ala.2010).
‘“In Ingram, the Supreme Court held that the circuit court’s adoption of the State’s proposed order denying *1226 postconviction relief was erroneous because, it said, the order stated that it was based in part on the personal knowledge and observations of the trial judge when the judge who actually signed the order denying the postcon-viction petition was not the same judge who had presided over Ingram’s capital-murder trial. “[T]he patently erroneous nature of the statements regarding the trial judge’s ‘personal knowledge’ and observations of Ingram’s capital-murder trial undermines any confidence that the trial judge’s findings of fact and conclusions of law are the product of the trial judge’s independent judgment. ...” Ingram, 51 So.3d at 1125.
“ ‘Our first opportunity to consider this issue after the Supreme Court’s decision in Ingram came in James v. State, 61 So.3d 357 (Ala.Crim.App.2010) (opinion on application for rehearing). We upheld a circuit court’s order, adopted verbatim from the State’s proposed order, over a claim that in adopting the State’s order the circuit court had violated Ingram and the United States Supreme Court’s opinion in Jefferson v. Upton, 560 U.S. 284, 130 S.Ct. 2217, 176 L.Ed.2d 1032 (2010). We stated:
“ ‘ “The main concerns the Supreme Court found objectionable in Ingram are not present in this case; here, the same judge presided over both James’s trial and the Rule 32 proceedings. Also, as we noted in our previous opinion in this ease, the circuit court allowed both ‘parties to submit proposed orders.’
“ ‘ “In Jefferson v. Upton, [560 U.S. 284, 130 S.Ct. 2217 (2010),] the United States Supreme Court remanded Jefferson’s habeas corpus proceedings to the lower court for that court to determine whether the state court’s factual findings warranted a presumption of correctness. The Supreme Court in granting relief stated:
“ ‘ “ ‘Although we have stated that a court’s “verbatim adoption of findings of fact prepared by prevailing parties” should be treated as findings of the court, we have also criticized that practice. Anderson [v. City of Bessemer City ], 470 U.S. [564] at 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 [ (1985) ]. And we have not considered the lawfulness of, nor the application of the habeas statute to, the use of such a practice where (1) a judge solicits the proposed findings ex parte, (2) does not provide the opposing party an opportunity to criticize the findings or to submit his own, or (3) adopts findings that contain internal evidence suggesting that the judge may not have read them. Cf. id., at 568, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518; Ga. Code of Judicial Conduct, Canon 3(A)(4) (1993) (prohibiting ex parte judicial communications).” ’
“ ‘James v. State, 61 So.3d at 385 (on rehearing).
“ ‘Here, the circuit judge who signed the order denying postconviction relief was the same judge who presided over Ray’s guilt and penalty proceedings — the judge who sentenced Ray to death. None of the concerns the Supreme Court stressed in Ingram are present in this case. Moreover, for the reasons detailed in this opinion, we hold that the circuit court’s findings are not “clearly erroneous.” ’
“Ray [v. State], 80 So.3d [965] at 972 [ (Ala.Crim.App.2011) ].
*1227 “Shortly after this Court released Ray, the Alabama Supreme Court released its opinion in Ex parte Scott, [Ms. 1091275, March 18, 2011] — So.3d — (Ala.2011). In Scott, the Alabama Supreme Court held that a circuit court’s order summarily dismissing a Rule 32 petition, which adopted verbatim the State’s answer to the Rule 32 petition, violated the requirement that the order reflect the circuit court’s independent findings and conclusions of law.
“In Scott, after the State filed its answer to Scott’s Rule 32 petition, the circuit court requested and received an electronic copy of the State’s answer. The circuit court subsequently issued a written order summarily denying Scott’s Rule 32 petition. The circuit court’s order essentially adopted verbatim the State’s answer to the Rule 32 petition.
“Scott filed an objection to the circuit court’s order, which the circuit court denied. This Court affirmed the circuit court’s order denying Scott’s Rule 32 petition. Scott v. State, [Ms. CR-06-2233, March 26, 2010] — So.3d — (Ala.Crim.App.2010). The Alabama Supreme Court granted Scott’s petition for a writ of certiorari and held that the circuit court’s adoption of the State’s answer to the Rule 32 petition conflicted with its decision in Ex parte Ingram, 51 So.3d 1119 (Ala.2010). The Court reasoned:
“ ‘Scott argues that the trial court’s order contains the same citation to caselaw that had been overruled by this Court two years before the entry of the trial court’s order and the same typographical errors as contained in the State’s answer. Moreover, Scott contends that because the trial court adopted nearly verbatim the State’s answer as its order, the order is infected with the adversarial zeal of the State’s counsel. Thus, Scott argues that the trial court’s order cannot reflect the independent and impartial findings of the trial court and cannot be the product of the trial court’s independent judgment. As for Scott’s claim that the presence in the trial court’s order of the same typographical errors contained in the State’s answer is evidence that the trial court’s order is not a product of the independent judgment of the trial court, we note that Scott has directed this Court to only two examples of such typographical errors appearing in the approximately 58 pages of text that constitute the State’s answer and the trial court’s order. This Court recognized in Ex parte Ingram[, 51 So.3d 1119 (Ala.2010),] that sometimes minor errors find their way into orders drafted by trial courts. We do not consider the few typographical errors at issue here, by themselves, as sufficient evidence upon which to base a conclusion that the trial court’s order is not a product of the trial court’s independent judgment. The fact that the same typographical errors appear in the same locations in both the State’s answer and the trial court’s order does, however, bolster this Court’s conclusion reached infra that the trial court’s order is not a product of its independent judgment. We also note that the State’s answer and the trial court’s order are both 58 pages in length. Again, although this fact alone is insufficient evidence upon which to base a conclusion that the order is not a product of the trial court’s independent judgment, it bolsters this Court’s conclusion reached infra that the trial court’s order is not a product of its independent judgment.
*1228 “ ‘Further, Scott notes that in adopting the State’s answer the trial court repeated in its order the State’s citation to and reliance upon Williams v. State, 783 So.2d 108 (Ala.Crim.App.2000), a case that had been overruled by this Court approximately two years before the trial court entered its order in this case. In Ex parte Taylor, 10 So.3d 1075 (Ala.2005), this Court by implication overruled the Court of Criminal Appeals’ holding in Williams that “ ‘a finding of no manifest injustice under the “plain error” standard on a direct appeal serves to establish a finding of no prejudice under the test for ineffective assistance of counsel provided in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).’ ” Williams, 783 So.2d at 133 (quoting State v. Clark, 913 S.W.2d 399, 406 (Mo.Ct.App.1996) (footnote omitted)). The trial court did not cite Williams for purposes of that holding; rather, it is clear that Williams was cited in support of the trial court’s conclusion that Scott had failed to satisfy his burden of pleading under Rule 32. There is no error in citing and relying upon a case for a particular proposition of law when that case has been reversed on a ground other than the specific proposition of law being relied upon. The trial court’s citation to Williams in this case does not rise to the level of a material and obvious error as contemplated by the holding in Ex parte Ingram, supra. Accordingly, we do not consider the trial court’s citation to Williams as evidence indicating that the trial court’s order is not a product of the trial court’s independent judgment.
“ ‘More troubling is Scott’s contention that because the trial court adopted verbatim the State’s answer as its order, the order is infected with the same adversarial zeal of the State’s counsel as is the answer. Scott contends that, although an order prepared by a party for the proposed adoption by the trial court purports to be disinterested, the adversarial zeal of counsel all too often infects the adopted order of the trial court, which is supposed to contain disinterested findings. See Cuthbertson v. Biggers Bros., Inc., 702 F.2d 454 (4th Cir.1983). Scott contends that an answer is a pleading that never is prepared with the pretense of impartiality. We agree. As Scott contends, an answer, by its very nature, is adversarial and sets forth one party’s position in the litigation. It makes no claim of being an impartial consideration of the facts and law; rather, it is a work of advocacy that exhorts one party’s perception of the law as it pertains to the relevant facts. The Court of Criminal Appeals acknowledged the nature of the State’s answer in this case, stating that “the pleading clearly advocated and sought summary dismissal of the majority of Scott’s claims.” Scott v. State, — So.3d at —.
“ ‘This Court stated in Ex parte Ingram that the “appellate courts must be careful to evaluate a claim that a prepared order drafted by the prevailing party and adopted by the trial court verbatim does not reflect the independent and impartial findings and conclusions of the trial court.” Ex parte Ingram, 51 So.3d at 1124 (emphasis added). Here, we do not even have the benefit of an order proposed or “prepared” by a party; rather the order is a judicial incorporation of a party’s pleading as the “independent and impartial findings and conclusions of the trial court.” Id. at *1229 1124. The first and most fundamental requirement of the reviewing court is to determine “that the order and the findings and conclusions in such order are in fact those of the trial court.” Id. at 1124. The trial court’s verbatim adoption of the State’s answer to Scott’s Rule 32 petition as its order, by its nature, violates this Court’s holding in Ex parte Ingram. Accordingly, we must reverse the Court of Criminal Appeals’ judgment insofar as it affirms the trial court’s adoption of the State’s answer as its order, and we remand the case to the Court of Criminal Appeals with directions to remand the case to the trial court for that court to reverse its order dismissing Scott’s Rule 32 petition and to enter a new order in light of this opinion.’
“— So.3d at —.”
Miller, 99 So.3d at 355-59. See also Ray v. State, 80 So.3d 965, 992 (Ala.Crim.App.2011).
Here, the fact situation is distinguishable from the fact situations in both Ex parte Ingram and Ex parte Scott. In this case, the circuit judge who denied McWhorter’s postconviction petition did not preside at McWhorter’s trial; however, in the order denying McWhorter’s post-conviction petition the court did not profess to have personal knowledge of the performance of McWhorter’s trial counsel. Further, the circuit court in this case did not base its order denying McWhorter’s postconviction petition upon the State’s initial answer to the postconviction petition. Instead, after numerous pleadings, and after the postconviction evidentiary hearing on McWhorter’s Rule 32 claims, the court allowed submission of briefs. Both the State and McWhorter submitted proposed orders, and McWhorter submitted a post-hearing brief. McWhorter did not object in his post-hearing brief to the possibility of the circuit court’s adopting the State’s proposed order. The circuit court did not issue its final order until several weeks after both the State and McWhorter had submitted their proposed orders and McWhorter had filed his post-hearing brief.
Consequently, in light of these facts, we conclude that the circuit court’s order is its own and not merely an unexamined adoption of a proposed order submitted by the State. Moreover, for the reasons set forth above in regard to the juror-misconduct claims and below as to the other claims McWhorter raises on appeal, we hold that the circuit court’s findings are not “clearly erroneous.”
II.
McWhorter argues he was denied his constitutional right to effective assistance of counsel at the penalty phase. (Claim XII in McWhorter’s amended Rule 32 Petition.) More particularly, McWhorter alleges that his counsel did not adequately investigate and present mitigation evidence and that his attorneys’ performance was deficient during the penalty and sentencing phases. Before addressing McWhorter’s specific arguments, we set forth the general principles of law regarding ineffective-assistance-of-counsel claims.
Allegations of ineffective assistance of counsel are governed by the principles set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on a claim of ineffective assistance of counsel, the petitioner must establish: (1) that counsel’s performance was deficient and (2) that the petitioner was prejudiced by the deficient performance. 466 U.S. at 687; Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
*1230 “Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See Michel v. Louisiana, [350 U.S. 91], at 101 [76 S.Ct. 158, 100 L.Ed. 83 (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
Strickland, 466 U.S. at 689 (citations omitted). As the United States Supreme Court further stated:
“[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.”
Strickland, 466 U.S. at 690-91.
With regard to an attorney’s duty to investigate, we have said:
While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, ‘this duty only requires a reasonable investigation.’ Singleton v. Thigpen, 847 F.2d 668, 669 (11th Cir.(Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See Strickland [v. Washington ], 466 U.S. [668] at 691, 104 S.Ct. [2052] at 2066, 80 L.Ed.2d 674 [(1984)]; Morrison v. State, 551 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel’s obligation is to conduct a ‘substantial investigation into each of the plausible lines of defense.’ Strickland, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). ‘A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.’ Id., 466 U.S. at 686, 104 S.Ct. at 2063.
“ ‘The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strate *1231 gic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.’
“Id., 466 U.S. at 691, 104 S.Ct. at 2066.”
Jones, 753 So.2d at 1191.
“The purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992) (‘We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.’). We recognize that ‘[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.’ Strickland, [466 U.S. at 693,] 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or ‘what is prudent or appropriate, but only what is constitutionally compelled.’ Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).”
Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir.2000) (footnote omitted).
“As the Supreme Court explained in Strickland, the issue of what investigation decisions are reasonable ‘depends critically’ on the defendant’s instructions.... ” Cummings v. Secretary, Dep’t of Corr., 588 F.3d 1331,1357 (11th Cir.2009).
Moreover,
“there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel’s performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel’s performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.”
Strickland, 466 U.S. at 697. “It is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied.” Buehl v. Vaughn, 166 F.3d 163,172 (3d Cir.1999).
In Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the United States Supreme Court addressed a claim that counsel was ineffective for failing to adequately investigate and present mitigation evidence. The Wiggins Court found that counsel’s performance was ineffective because counsel failed to investigate and present evidence that Wiggins had a dysfunctional and bleak upbringing, that he suffered from substantial physical and sexual abuse, and that he had mental deficiencies. The Court stated:
“Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant’s moral culpability. *1232 Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (‘ “[Ejvidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable than defendants who have no such excuse” ’); see also Eddings v. Oklahoma, 455 U.S. 104,112 (1982) (noting that consideration of the offender’s life history is a ‘ “part of the process of inflicting the penalty of death” ’); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (invalidating Ohio law that did not permit consideration of aspects of a defendant’s background).”
539 U.S. at 535. The Court further stated:
“In finding that [trial counsel’s] investigation did not meet Strickland’s performance standards, we emphasize that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the ‘constitutionally protected independence of counsel’ at the heart of Strickland, 466 U.S., at 689. We base our conclusion on the much more limited principle that ‘strategic choices made after less than complete investigation are reasonable’ only to the extent that ‘reasonable professional judgments support the limitations on investigation.’ Id., at 690-691. A decision not to investigate thus ‘must be directly assessed for reasonableness in all the circumstances.’ Id., at 691.
“Counsel’s investigation into Wiggins’ background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records — evidence that would have led a reasonably competent attorney to investigate further.”
539 U.S. at 533-34.
In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court found that counsel’s performance was deficient because counsel did not begin to investigate mitigation evidence until a week before trial and counsel “failed to conduct an investigation that would have uncovered extensive records graphically describing Williams’s nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records.” 529 U.S. at 395.
“The United States Court of Appeals for the Eleventh Circuit has held that trial counsel’s failure to investigate the possibility of mitigating evidence is, per se, deficient performance. See Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir.1991) (‘our case law rejects the notion that a “strategic” decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them’), cert. denied, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992); see, also, Jackson v. Herring, 42 F.3d 1350, 1366-68 (11th Cir.) (‘Although counsel need not “investigate every evidentiary lead,” he must gather enough knowledge of the potential mitigation evidence to arrive at an “informed judgment” in making [the decision not to present such evidence].... *1233 [A] legal decision to forgo a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation.’) (emphasis added; citations omitted), cert. dismissed, 515 U.S. 1189, 116 S.Ct. 38,132 L.Ed.2d 919 (1995).”
Ex parte Land, 775 So.2d 847, 853-54 (Ala.2000), overruled on other grounds by State v. Martin, 69 So.3d 94, 97 (Ala.2011).
In Jackson v. Herring, 42 F.3d 1350 (11th Cir.1995), the United States Court of Appeals for the Eleventh Circuit stated:
“In cases where sentencing counsel did not conduct enough investigation to formulate an accurate life profile of a defendant, we have held the representation beneath professionally competent standards. See, e.g., Blanco [v. Singletary ] 943 F.2d [1477] 1501-03 [(11th Cir.1991)] (counsel’s performance deficient where his sole attempt to procure mitigation witnesses for penalty phase was to leave messages for the witnesses and await their responses, and he thus ultimately conducted no interviews); Harris [v. Dugger ], 874 F.2d [756] 763 [ (11th Cir.1989) ] (counsel deficient where he did not investigate defendant’s family, scholastic, military and employment background); Middleton [v. Dugger], 849 F.2d [491] 493 [(11th Cir.1988) ] (performance deficient where ‘trial counsel conducted almost no background investigation, despite discussions with Middleton concerning the existence of such mitigating evidence’ as psychiatric problems, brutal childhood, physical, sexual and drug abuse, and low I.Q.); Armstrong [v. Dugger], 833 F.2d [1430] 1433-34 [ (11th Cir.1987) ] (performance deficient where trial counsel’s investigation of mitigating evidence was limited to single conversation with defendant and his parents, and another conversation with defendant’s parole officer).”
42 F.3d at 1367.
In examining this ineffectiveness claim, the circuit court described what McWhorter’s attorneys did during the penalty phase. The court’s findings were based primarily on the testimony of the attorneys — Mitchell and Berry. As set out above, the testimony at the evidentiary hearing indicated that to prepare for the penalty phase, Mitchell and Berry interviewed McWhorter, his mother Rowland, his aunt Garrison, and his half sister Melinda Rowland. They interviewed the latter three in what McWhorter refers to in the postconviction proceeding as the “triple interview.” During this interview, counsel completed a document entitled “Client Background Information,” which included McWhorter’s family history, his medical and mental-health history, his substance-abuse history, his criminal history, and his education history. An investigator was not hired for the penalty-phase preparation because, according to McWhorter’s attorneys, a strategy could be formulated with McWhorter and his family’s assistance.
McWhorter’s trial attorneys hired Dr. Douglas Robbins, a neuropsychologist, to evaluate McWhorter for any mental disease, mental disorder, or any evidence of psychopathology. As stated above, Dr. Robbins’s evaluation provided no useful mitigation evidence.
Counsel obtained some hospital records. Counsel was aware that DHR had once investigated an allegation of physical abuse involving McWhorter. Additionally, as set out above, counsel had documentation of McWhorter’s IQ scores, which indicated he had an IQ of 88.
Mitchell and Berry testified that they thought McWhorter would have had to climb out of a “deep hole” to persuade the *1234 judge and jury to spare his life. The two codefendants had pleaded guilty, and the jury had heard evidence of gang activity. McWhorter’s attorneys decided that “about the only thing” McWhorter had “going for him” was that he was “clean cut” and “a good-looking young man” who had fallen in with the wrong crowd and had made a terrible mistake but did not deserve the death penalty.
As indicated above, counsel presented the testimony of Rowland, Garrison, Reid, and Salee during the penalty phase. Counsel testified as to why each was chosen to testify in accordance with counsel’s strategy. The circuit court found that this strategy was a reasonable one and that counsel had conducted a reasonable investigation.
Considering the above principles and the evidence that was presented at the post-conviction hearing, we consider McWhorter’s specific allegations of ineffective assistance of trial counsel presented on appeal.
A.
McWhorter appears to argue that the circuit court should have examined his allegations of ineffectiveness at the penalty phase as a single claim rather than as several separate claims. McWhorter argues that “[ejven if the failure to call a particular witness did not constitute ineffective assistance of counsel, the correct question — which was never addressed by the Hearing Court — was whether it was constitutionally ineffective assistance of counsel to fail to call any of them.” (McWhorter’s brief, pp. 42-43.) McWhorter asserts that the United States Supreme Court has made it “clear that the evidence that trial counsel did not seek to introduce — that is, the evidence of counsel’s ineffectiveness — must be weighed in the aggregate.” (McWhorter’s brief, p. 43.)
Initially, we question whether this argument is properly before this Court. McWhorter did not raise his cumulative-effect claim in his postjudgment motion. “The general rules of preservation apply to Rule 32 proceedings.” Boyd v. State, 913 So.2d 1113, 1123 (Ala.Crim.App.2003). Although McWhorter did assert a claim at the conclusion of his amended petition that the cumulative effect of his numerous ineffective-assistance-of-counsel claims entitled him to relief, he did not argue this at the evidentiary hearing, and the circuit court did not address it in its order.
Regardless, even if this argument is properly before this Court, it is without merit. McWhorter cites Porter v. McCollum, 558 U.S. 30, 44,130 S.Ct. 447, 453-54, 175 L.Ed.2d 398 (2009), for the proposition that “in considering the ineffectiveness of counsel a reviewing court should ‘consider the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced at the habeas proceeding — and reweigh it against the evidence in aggravation.’ ” (McWhorter’s brief, p. 43 (quoting Porter, 558 U.S. at 41, 130 S.Ct. at 453-54).) McWhorter’s reliance on Porter is misplaced. The quoted portion from Porter occurs in the United State Supreme Court’s analysis of whether counsel’s deficient performance prejudiced the defendant, the second prong under Strickland analysis. The Supreme Court in Porter had already determined that counsel’s failure to investigate mitigating evidence in that case was constitutionally deficient. McWhorter, however, cites the language from Porter in support of the proposition that all the available mitigation evidence should be evaluated to determine whether counsel’s performance was deficient. Similarly, the other authorities McWhorter cites fail to support his argument that the circuit court must evaluate all the allegations of ineffective assistance as one claim asserting that counsel was *1235 deficient. See McGahee v. Alabama Dep’t of Corr., 560 F.3d 1252, 1261-63 (11th Cir.2009) (addressing Batson, not deficiency-prong, of Strickland); Williams v. Allen, 542 F.3d 1326, 1344 (11th Cir.2008) (addressing the prejudice prong not the deficiency prong in Strickland analysis); Scott v. Schriro, 567 F.3d 573, 586 (9th Cir.2009) (same as Williams v. Allen); Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir.1991) (discussing “the cumulative effect of all of counsel’s actions” in the context of the court’s holding that the petitioner had not exhausted his state remedies).
In his reply, McWhorter acknowledges that this Court has recently stated that no Alabama appellate court has applied “the cumulative-effect analysis to claims of ineffective assistance of counsel.” Taylor v. State, [Ms. CR-05-0066, Oct. 1, 2010] — So.3d —,—(Ala.Crim.App.2010). Although McWhorter asserts that the Taylor court did, in fact, perform a cumulative-effects analysis, (McWhorter’s reply, p. 13), we conclude that assertion is misplaced. As the Taylor court actually explained:
“Taylor also contends that the allegations offered in support of a claim of ineffective assistance of counsel must be considered cumulatively, and he cites Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). However, this Court has noted: ‘Other states and federal courts are not in agreement as to whether the “cumulative effect” analysis applies to Strickland claims’; this Court has also stated: ‘We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective assistance of counsel.’ Brooks v. State, 929 So.2d 491, 514 (Ala.Crim.App.2005), quoted in Scott v. State, [Ms. CR-06-2233, March 26, 2010]— So.3d —, — (Ala.Crim.App.2010); see also McNabb v. State, 991 So.2d 313, 332 (Ala.Crim.App.2007); and Hunt v. State, 940 So.2d 1041, 1071 (Ala.Crim.App.2005). More to the point, however, is the fact that even when a cumulative-effect analysis is considered, only claims that are properly pleaded and not otherwise due to be summarily dismissed are considered in that analysis. A cumulative-effect analysis does not eliminate the pleading requirements established in Rule 32, Ala. R.Crim. P. An analysis of claims of ineffective assistance of counsel, including a cumulative-effect analysis, is performed only on properly pleaded claims that are not summarily dismissed for pleading deficiencies or on procedural grounds. Therefore, even if a cumulative-effect analysis were required by Alabama law, that factor would not eliminate Taylor’s obligation to plead each claim of ineffective assistance of counsel in compliance with the directives of Rule 32.
“Taylor is not entitled to relief on either claim of error raised.”
Taylor, — So.3d at —.
In this case, McWhorter’s argument is flawed in'that he fails to demonstrate that a series of individual allegations of deficient performance — although found not to be deficient in themselves — could nevertheless be deficient when considered collectively. Further, an aggregate weighing is not required by Alabama law. See Taylor, — So.3d at —, and the cases cited therein. Therefore, even if the claim is properly before this Court for review, McWhorter is not entitled to any relief on this claim.
B.
McWhorter also argues that the circuit court “failed to consider” or address in its order the testimony of four witnesses: Abraham Barnes, Dr. Ralph Tarter, Ken *1236 neth Burns, and Dr. Robbins. McWhorter summarizes the testimony of these four witnesses in his brief to this Court.
Initially, we note that McWhorter did not plead anything in regard to these witnesses in his amended petition, even though these witnesses testified at the postconviction proceeding. Additionally, McWhorter fails to provide sufficient authority to reverse the circuit court’s judgment on the basis that it “failed to consider” the cited evidence. See Rule 28(a)(10), Ala. R.App. P.[13] Although McWhorter makes a conclusory argument that “each of these four witnesses provided unique and significant testimony concerning McWhorter’s life, character, and mental health” and the circuit court’s “failure to address this evidence ... violates the Supreme Court’s ruling that the ‘totality of the evidence’ be considered,” he does nothing else but simply state, in conclusory fashion, the testimony of the witnesses that he claims the circuit court failed to consider and page citations from the record. (McWhorter’s brief, pp. 44, 47.) He cites one case for all four witnesses’ testimony, alleging that it was error for trial counsel not to present testimony regarding McWhorter’s suicide attempt. He makes a conclusory argument why he believes these witnesses’ testimony was relevant. This Court recently addressed a similar issue in Taylor, — So.3d —:
“We are aware that application of Rule 28(a)(10) to find a waiver of arguments in an appellate brief has been limited to those cases in which the appellant presents general assertions and propositions of law with few or no citations to relevant legal authority, resulting in an argument consisting of undeli-neated general propositions unsupported by sufficient legal authority or argument. Although Rule 28(a)(10) is to be cautiously applied, it has been applied recently by the Alabama Supreme Court and by this Court when appropriate. E.g., Ex parte Theodorou, 53 So.3d 151 (Ala.2010); Jefferson County Comm’n v. Edwards, 32 So.3d 572 (Ala.2009); Slack v. Stream, 988 So.2d 516 (Ala.2008); James v. State, 61 So.3d 357 (Ala.Crim.App.2010) (opinion on remand from Alabama Supreme Court); Scott v. State, [Ms. CR-06-2233, March 26, 2010] — So.3d —(Ala.Crim.App.2010); Baker v. State, 87 So.3d 587 (Ala.Crim.App.2009); Lee v. State, 44 So.3d 1145 (Ala.Crim.App.2009); Bush v. State, 92 So.3d 121 (Ala.Crim.App.2009); and Franklin v. State, 23 So.3d 694 (Ala.Crim.App.2008).
“In Scott v. State, this Court stated:
“ ‘ “Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed.” Hamm v. State, 913 So.2d 460, 486 (Ala.Crim.App.2002). “An appellate court will consider only those issues properly delineated as such and will not search out errors which have not been properly preserved or assigned. This standard has been specifically applied to briefs containing general propositions devoid of delineation and support from authority or argument.” Ex parte Riley, 464 So.2d 92, 94 (Ala.1985) (citations omitted). “When an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court’s duty nor its function to perform an *1237 appellant’s legal research.” City of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 752 (Ala.1998).’
“Scott v. State, — So.3d at —. See also Hamm v. State, 913 So.2d 460, 486 n. 11 (Ala.Crim.App.2002) (‘Applying the federal counterpart to Alabama’s Rule 28, Ala. R.App. P., the United States Court of Appeals for the Eighth Circuit stated, “[W]e regularly decline to consider cursory or summary arguments that are unsupported by citations to legal authorities. See United States v. Wadlington, 233 F.3d 1067, 1081 (8th Cir.2000); United States v. Gonzales, 90 F.3d 1363, 1369 (8th Cir.1996); see also United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991) (‘Judges are not like pigs, hunting for truffles buried in briefs.’).” (U.S., v. Stuckey, 255 F.3d 528, 531 (8th Cir.2001).’).
“As the State correctly argues in its brief on appeal, many ‘arguments’ in Taylor’s brief consist of little more than a cursory summary of the claims from the petition....
[[Image here]]
“Clearly, Taylor’s cursory summary of the allegations of the petition — with a citation only to the paragraphs of the petition in many arguments of the brief, and in other portions of the brief only to paragraphs of the petition and undeli-neated general principles of law — does not comport with Rule 28(a)(10). For many of the issues raised in the brief, Taylor presents no discussion of the facts or the law in the form of an argument demonstrating why the circuit court’s dismissal of the specific claims was in error. Accordingly, we hold that Taylor has waived for purposes of appellate review in this Court those arguments in his brief ... that fail to comply with the requirements of Rule 28(a)(10).”
— So.3d at —.
Here, too, we conclude that McWhorter’s cursory summary of the witnesses’ testimony and only a single citation to general legal authority, with no specific discussion of the facts or law in the form of an argument as to why he claims error, is not sufficient to comply with Rule 28(a)(10). Furthermore, McWhorter acknowledges in his brief to this Court that the circuit court does not have to address every “scrap” of evidence in its order. (McWhorter’s brief, p. 44)
Moreover, even if McWhorter’s brief in this regard did satisfy the requirements in Rule 28(a)(10), his argument is inconsistent with the defense theory of the case or would have been otherwise cumulative. The circuit court found that defense counsel’s strategy in mitigation was reasonable and that additional evidence presented at the postconviction hearing would have been cumulative to evidence presented by trial counsel or would have been inconsistent with evidence presented to support trial counsel’s reasonable strategy. Specifically, with regard to McWhorter’s trial counsel’s strategy the circuit court found as follows:
“Experienced trial counsel collected the comprehensive background information reflected in [‘Client Background Information’], Dr. Robbins’s evaluation, and other documents, and formulated a reasonable strategy that they believed could save McWhorter’s life: McWhorter was a good boy, who fell in with the wrong crowd, and he made a terrible mistake but does not deserve the death penalty. (E.H. 186, 571.) The trial transcript reflects that strategy in the *1238 testimony trial counsel presented during the penalty and sentencing phases.”
(C. 1163-64.)
The circuit court’s findings are supported by the record. The testimony of these four witnesses would have been cumulative or inconsistent with the defense’s strategy of the case. Barnes’s testimony would have been wholly inconsistent with the “good boy, wrong crowd” strategy. Likewise, Dr. Tarter’s testimony (about McWhorter’s substance abuse) would have also been inconsistent with that strategy. Additionally, McWhorter fails to explain in his brief how or why Dr. Robbins’s testimony would have been helpful. Although Burns’s testimony might have been helpful, it too would have been cumulative in many respects. Therefore, McWhorter has failed to demonstrate error because the circuit court did not specifically address these four witnesses in its detailed order denying relief based on McWhorter’s ineffective-assistance-of-counsel claim.[14]
C.
McWhorter next argues that trial counsel was ineffective for failing to investigate and to present certain mitigation evidence at the penalty phase of his capital-murder trial. He contends that counsel should have started investigating earlier, should have spent more time investigating, should have interviewed more witnesses, and should have obtained more records, such as school records, social-services records, juvenile-offender records, and additional medical records. He also argues that trial counsel’s investigation into the mitigating evidence failed to comply with the American Bar Association (“ABA”) Guidelines for conducting an appropriate investigation into potential mitigating evidence in death-penalty cases.
Initially, we point out that whether McWhorter’s trial attorneys’ investigation into potential mitigating evidence adhered to the ABA Guidelines is not dispositive of whether counsel’s investigation was reasonable. This Court has previously decided this issue adversely to McWhorter in Miller, 99 So.3d at 396-97.
“ ‘We have held that the ABA Guidelines may “provide guidance as to what is reasonable in terms of counsel’s representation, [but] they are not determinative.” Jones v. State, 43 So.3d 1258, 1278 (Ala.Crim.App.2007).
“ ‘The danger of adopting the ABA Guidelines as determinative on the issue of a lawyer’s effectiveness was discussed by the United States Court of Appeals for the Fourth Circuit:
“ ‘ “[T]o hold defense counsel responsible for performing every task that the ABA Guidelines say he ‘should’ do is to impose precisely the ‘set of detailed rules for counsel’s conduct’ that the Supreme Court has long since rejected as being unable to ‘satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.’ Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052, 80 L.Ed.2d 674. Such a categorical holding would lead to needless and expensive layers of process with the unintended effect of compromising process.... Recognition of the ABA Guidelines as the minimum *1239 prevailing community standard would transform defense lawyers’ judgments into mindless defensive reactions to a potential habeas claim, divorced from the individualized needs of professional representation. Those needs call for more nuanced responses than can be provided by following preestablished mechanical rules of representation. ...
“ ‘ “While the ABA Guidelines provide noble standards for legal representation in capital cases and are intended to improve that representation, they nevertheless can only be considered as part of the overall calculus of whether counsel’s representation falls below an objective standard of reasonableness; they still serve only as ‘guides,’ Strickland, 466 U.S. at 688, 104 S.Ct. 2052, not minimum constitutional standards.”
“ ‘Yarbrough v. Johnson, 520 F.3d 329, 339 (4th Cir.2008). See also Torres v. State, 120 P.3d 1184,1189 (Okla.Crim.App.2005) (“[W]e will not find that capital counsel was per se ineffective simply because counsel’s representation differed from current capital practice customs, even where the differences are significant. A defendant must still show that he was prejudiced by counsel’s representation.”). We agree with the United States Court of Appeals for the Fourth Circuit.
“‘Also, the United States Supreme Court in Wiggins [v. Smith, 539 U.S. 510 (2003),] stated:
“ ‘ “[Cjounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. ... [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.
[O]ur principal concern in deciding whether [counsel] exercised ‘reasonable professional judg-men[t]’ is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel’s decision not to introduce mitigating evidence ... was itself reasonable. In assessing counsel’s investigation, we must conduct an objective review of their performance, measured for ‘reasonableness under prevailing professional norms,’ which includes a context-dependent consideration of the challenged conduct as seen ‘from counsel’s perspective at the time.’ ”
“ ‘539 U.S. at 521-23.’
“Ray, 80 So.3d at 983.”
99 So.3d at 396-97.
The circuit court found as follows regarding McWhorter’s ineffective-assistance-of-counsel claim:
“As an initial matter, McWhorter’s’ trial counsel both testified at length to their strategy for the penalty phase. The Court sets out that strategy below and finds it to be reasonable under Strickland. All of the remaining independent claims contained in Claim XII of McWhorter’s amended Rule 32 petition are meritless because they contend that trial counsel should have investigated and presented evidence that either would have been cumulative to evidence presented or would have been inconsistent with evidence presented to support trial counsel’s reasonable strategy. In his amended Rule 32 petition, McWhorter failed to mention, much less chai- *1240 lenge, the trial strategy that trial counsel actually used.
“The testimony of McWhorter’s trial counsel, Thomas Mitchell and James Berry, at the evidentiary hearing indicates that they rendered effective assistance of counsel during the penalty and sentencing phases of his trial. Mitchell and Berry both testified that, to prepare McWhorter’s mitigation case, they interviewed McWhorter, his mother, Carolyn Rowland, his aunt, Elsie Garrison, and his half sister, Melinda Rowland. (E.H. 139, 143, 154, 176, 190-91, 553, 557.) McWhorter and his family were fully cooperative and supportive, according to both counsel’s testimony. (E.H. 191, 193, 557.)
“During a pre-trial interview with McWhorter’s family, Mr. Mitchell completed a document titled ‘Client Background Information’ based on the information he learned from that interview. (E.H. 145.) The document was admitted into evidence at the evidentiary hearing as McWhorter’s Exhibit 7. (E.H. 146.) Exhibit 7 contains questions and answers covering myriad topics, like McWhorter’s early childhood development, his environmental factors; such as, living conditions, medical issues as a youth, and relationship information; his institutional data; such as, education history, his medical and mental health history, his substance abuse history, his criminal history, and his family history. Mr. Mitchell decided not to hire an investigator for the penalty-phase preparation because he reasonably could formulate a strategy for the penalty phase without an investigator and with McWhorter and his family’s assistance. (E.H. 193.)
“In addition to the information provided by McWhorter and his family, trial counsel hired a neuropsychologist to evaluate McWhorter for any ‘mental disease,’ ‘mental disorder,’ or ‘any evidence of psychopathology' to use in McWhorter’s defense. (E.H. 155, 171.) Trial counsel hired Dr. Douglas Robbins. Mitchell testified that he specifically was interested in learning from Dr. Robbins whether McWhorter exhibited ‘diminished capacity' and ‘susceptibility to influence’ from others. (E.H. 171.) And, if McWhorter had brain damage, trial counsel wanted to use that fact in his defense. (E.H. 160.) However, Dr. Robbins’s evaluation provided no useful mitigation evidence. (E.H. 175, 305.)
“Trial counsel also considered various records. They obtained McWhorter’s hospital records from his attempted suicide. (E.H. 557.) Mitchell testified that he was aware that Garrison once reported Carolyn Rowland to DHR because Garrison found bruises on McWhorter from a ‘whipping' that Carolyn Rowland gave him. (E.H. 158; McWhorter’s Exhibit 7, page 5.) Trial counsel also had documentation of McWhorter’s IQ scores, which indicated that he has an IQ of 88. (E.H. 140,181.)
“As Berry explained during the evi-dentiary hearing, McWhorter would have had to climb from a ‘deep hole’ to persuade the judge and jury to spare his life. (E.H. 571-72.) Two codefendants already had pleaded guilty to charges stemming from the same crime. (Ibid.) The jury had heard evidence of gang activity. (E.H. 573.) Trial counsel believed that McWhorter had very little in his favor going into the penalty phase. ‘About the only thing we had going for Casey was a young man. He was a good-looking young man. And his youth was basically the only thing we had going for us,’ said Berry. (E.H. 576.) Mitchell’s testimony reflected a similar opinion. Mitchell thought the main circumstances McWhorter had in his favor *1241 were his youth, that he was ‘clean cut,’ and that ‘he looked like Opie grown up a little bit from the Andy Griffith Show.’ Mitchell also remembered first meeting McWhorter and how he thought that McWhorter must have been ‘crazy' to commit the crime with which he was charged. (E.H. 185-86.) Mitchell hoped that that the jury would think that, too, though he knew there was no evidence to support a mitigation case based on McWhorter’s mental disorders because McWhorter had none. (Ibid.)
“Both counsel previously had represented defendants at capital murder trials. (E.H. 170, 544.) Mitchell, who served as McWhorter’s lead counsel, had extensive relevant experience over his 11-year legal career. (E.H. 169.) Mitchell testified that he had represented defendants during approximately 25 felony jury trials, 8 to 10 of which were murder trials, prior to representing McWhorter. (E.H. 169-70.) The overwhelming majority of Berry’s practice around the time of McWhorter’s trial was criminal work, and Mitchell testified that about half of his practice was criminal around 1994. (E.H. 169, 566.)
“Experienced trial counsel collected the comprehensive background information reflected in McWhorter’s Exhibit 7, Dr. Robbins’s evaluation, and other documents, and formulated a reasonable strategy that they believed could save McWhorter’s life: McWhorter was a good boy, who fell in with the wrong crowd, and he made a terrible mistake but does not deserve the death penalty. (E.H. 186, 571.) The trial transcript reflects that strategy in the testimony trial counsel presented during the penalty and sentencing phases.
“After conducting a reasonable investigation and forming a reasonable trial strategy, trial counsel decided to present the testimony of four witnesses during the penalty phase: Carolyn Rowland, Elsie Garrison, Van Reid, and Vonnie Salee. Carolyn Rowland, McWhorter’s mother, and Garrison, his aunt, were selected because they knew McWhorter well and because their pain felt over McWhorter’s capital murder trial was ‘obvious,’ and trial counsel hoped to evoke sympathy from the jury. (E.H. 190.) Garrison testified during the penalty phase that McWhorter once was wrongly accused of using drugs, so she had him drug tested. The test confirmed that there were no drugs in McWhorter’s system. (R. 1782.) She also testified that McWhorter was ‘compassionate,’ but that he got caught up with the wrong crowd, including Daniel Miner, a codefendant in this case. (R. 1784-85.) Carolyn Rowland also testified that McWhorter had been a ‘good kid’ until he started spending time with Daniel Miner, Lee Williams, and Marcus Carter, all of whom were codefendants in this case. (R. 1792-93.)
“Garrison recommended Van Reid. (E.H. 189.) Reid knew McWhorter around the time of the murder because McWhorter worked as a busboy at Reid’s restaurant, and Reid knew McWhorter to be a young man who did his job well. (E.H. 190; R. 1176-77.) Vonnie Salee was picked to testify partly because she was ‘very likable.’ (E.H. 188.) Salee, like Reid, also knew McWhorter to be a good worker. (R. 1772.) McWhorter bagged groceries at the grocery store where Salee was a cashier. (Ibid.) She recalled that McWhorter once had rubbed the shoulders of an older lady cashier who complained that her shoulders and back were hurting. (R. 1773.)
“Trial counsel’s ‘good boy, wrong crowd’ strategy also was applied to the sentencing phase before Judge Gulla- *1242 horn. Trial counsel presented additional testimony from Garrison and Carolyn Rowland, along with Janice Miller, McWhorter’s aunt by marriage. The trial transcript and the evidentiary hearing transcript show that trial counsel presented meaningful testimony during the penalty and sentencing phases that was consistent with their strategy, and they refrained from presenting additional evidence that would have detracted from their strategy.”
(C. 1159-65.)
Specifically, as to the “triple interview,” and the timeliness of the mitigation investigation, the primary cases on which McWhorter relies are Correll v. Ryan, 539 F.3d 938, 945 (9th Cir.2008), and State v. Gamble, 63 So.3d 707 (Ala.Crim.App.2010). Those cases are clearly distinguishable from this case. Although the “triple interview” in Correll is somewhat similar to the “triple interview” in this case, Comil is distinguishable because in that case trial counsel put on no evidence during the penalty phase — he did not call a single witness, and he waived the presentation of mitigating evidence. Additionally, there was evidence indicating the trial counsel in Correll spent a total of five minutes interviewing the defendant in Comil regarding mitigation evidence. In McWhorter’s case, his trial counsel introduced the evidence described above and did substantially more than did trial counsel in Comil. Likewise, in Gamble, no witnesses were called to testify in Gamble’s behalf during the penalty phase. As mentioned above, McWhorter’s attorneys called several witnesses to testify during the penalty phase of his capital-murder trial and adhered to their trial strategy as discussed with McWhorter and his family.
Regarding the records documenting McWhorter’s family history and his medical and school records, the circuit court denied relief on these claims for several reasons. First, as to the records of McWhorter’s family history, the records related to his father, and social-services records, the court found that McWhorter failed to meet the specificity requirements of Rule 32.6(b), Ala. R.Crim. P., because he failed to identify what records counsel should have obtained. Regarding his parents’ divorce records, the circuit court also concluded that McWhorter pleaded “only vaguely what those records would have proved.” (C. 1181.) The circuit court also denied relief because, it found, McWhorter failed to meet his burden of proving that his trial counsel’s performance was deficient in regard to information on his family history, specifically, information about his father, and information contained in his educational and medical records. The circuit court also denied relief on the educational-records claim, the medical-records claim, and the records-related-to-his-father claim because, the court found, McWhorter had failed to establish that he was prejudiced by his trial counsel’s penalty-phase performance. Specifically, when denying relief on these claims, the postconviction court stated:

“xiii The Claim That Trial Counsel Should Have Obtained Records Documenting McWhorter’s Family History

“McWhorter’s claim that his trial counsel were ineffective for failing to obtain records documenting his family history is contained in paragraph 193 of his amended Rule 32 petition.
“This claim is denied because it fails to meet Rule 32.6(b)’s ‘clear and specific’ pleading requirement. McWhorter first does not identify what records trial counsel allegedly was ineffective for failing to obtain other than ‘divorce records.’ As for the divorce records, McWhorter pleads only vaguely what *1243 those records would have proved, stating those records would have ‘corroborated the disintegration of Casey’s parents’ union and Tommy McWhorter’s subsequent two marriages.’ But McWhorter does not plead how he was prejudiced when it is clear from the pleading itself that these records only would have ‘corroborated’ some unidentified witness’s testimony. As such, this claim is denied because it is insufficiently pleaded.
“In the alternative, this claim is denied because McWhorter failed to meet his burden of proof. Concerning divorce records, trial counsel conducted an interview of McWhorter’s mother, Carolyn Rowland, where they learned of McWhorter’s parents’ divorce. There was no need for trial counsel to obtain documentation verifying the divorce when Carolyn Rowland, for example, could and did testify to facts related to the divorce. Carolyn Rowland told trial counsel during that pre-trial Interview with McWhorter’s family that her divorce with Tommy McWhorter was not ‘bitter.’ (E.H. 181-82.) She testified to that fact during the penalty phase, too. (R. 1789.) Because records were not necessary to establish facts relevant to McWhorter’s parents’ divorce, trial counsel were not ineffective for failing to obtain them. As such, this claim is denied.

“xiv. The Claim That Trial Counsel Should Have Obtained Educational Records

“McWhorter’s claim that his trial counsel were ineffective for failing to obtain educational records is contained in paragraphs 194 through 195 of his amended Rule 32 petition.
“This claim is denied because McWhorter failed to meet his burden of proof. McWhorter asserts in his petition that educational records would have shown school transfers and his ‘declining academic performance.’ As discussed at length above, McWhorter’s family, including his mother and aunt, fully cooperated with trial counsel’s mitigation investigation. Trial counsel did not need to obtain educational records in order to show that McWhorter’s grades were poor at times or that he transferred schools. In fact, Elsie Garrison testified to McWhorter’s high school transfers. (R. 1786-87.) McWhorter does not allege what additional information educational records would have uncovered. Trial counsel’s performance, therefore, was not deficient, and McWhorter did not suffer prejudice. As such, this claim is denied.

“xv. The Claim That Trial Counsel Should Have Obtained Medical Records

“McWhorter’s claim that his trial counsel were ineffective for failing to obtain medical records is contained in paragraphs 196 through 198 of his amended Rule 32 petition.
“This claim is denied because McWhorter failed to meet his burden of proof. McWhorter asserts in his petition that medical records would have established that ‘before age three, Casey had an unusually high number of accidents and medical problems,’ that he was involved in a life [sic].
“McWhorter’s claim that his trial counsel were ineffective for failing to obtain DHR records is contained in paragraphs 199 through 202 of his amended Rule 32 petition.
“This claim is denied because it fails to meet Rule 32.6(b)’s ‘clear and specific’ pleading requirement. McWhorter first does not plead specifically what the DHR records would contain. Instead, the petition states, ‘Most likely, from what counsel have learned, the docu *1244 ment relates to an allegation that Petitioner was an abused or neglected child.’ (Pet. at para. 200.) Because McWhorter does not plead what was in the DHR records, this claim is insufficiently pleaded.
“In the alternative, this claim is denied because McWhorter failed to meet his burden of proof. Though McWhorter asserts, in conclusory fashion, that the DHR records contain that he was an ‘abused or neglected child,’ the evidence presented at the evidentiary hearing did not support that allegation. Plus, trial counsel did not need to obtain the records from DHR because Garrison, who cooperated fully with trial counsel, filed the DHR report on Carolyn Rowland for leaving bruises on McWhorter after ‘whipping’ him. (McWhorter’s Exhibit 7, page 5.) Garrison’s complaint was the only document in the DHR records presented at the evidentiary hearing. (McWhorter’s Exhibit 11.) No further action was taken by DHR. (McWhorter’s Exhibit 7, page 5; E.H. 158.) DHR records would not have changed trial counsel’s reasonable mitigation strategy. Trial counsel’s performance, therefore, was not deficient, and McWhorter did not suffer prejudice. As such, this claim is denied.

“xvii. The Claim That Trial Counsel Should Have Obtained Records Related To Tommy McWhorter

“McWhorter’s claim that his trial counsel were ineffective for failing to obtain records related to his father, Tommy McWhorter, is contained in paragraphs 203 through 204 of his amended Rule 32 petition.
“This claim is denied because it fails to meet Rule 32.6(b)’s ‘clear and specific’ pleading requirement. McWhorter does not plead specifically what agency’s records trial counsel should have obtained. Therefore, this claim is insufficiently pleaded.
“In the alternative, this claim is denied because McWhorter failed to meet his burden of proof. Trial counsel did not need records to learn of Tommy McWhorter’s past. Trial counsel discussed with McWhorter’s family facts related to Tommy McWhorter. But, according to McWhorter’s family, McWhorter and his father ‘did not have much contact.’ (E.H. 181.) Carolyn Rowland also told trial counsel that her divorce with Tommy McWhorter was not ‘bitter.’ (E.H. 181-82.) She testified to that fact during the penalty phase, too. (R. 1789.) Trial counsel, therefore, decided that Tommy McWhorter’s life did not impact McWhorter enough to be pertinent to the penalty phase.
“In addition, the facts that trial counsel knew about Tommy McWhorter would have been inconsistent with their mitigation strategy. Trial counsel knew that Tommy McWhorter was a violent alcoholic and a criminal, but they did not want those facts presented to the jury because they feared that the jury would infer that ‘the apple doesn’t fall far from the tree’ and that McWhorter, therefore, was a ‘bad seed.’ (E.H. 158-59, 579-80.) Plus, trial counsel thought the jury would be interested in hearing mitigation evidence related to McWhorter’s life, and not his father’s. (E.H. 579-80.) Strategic decisions are ‘virtually unassailable, especially when they are made by experienced criminal defense attorneys,’ like McWhorter’s counsel. Williams v. Head, 185 F.3d [1223] at 1242 (11th Cir.1999).
“Thus, Tommy McWhorter’s records would not have changed trial counsel’s reasonable mitigation strategy. Trial counsel’s performance, therefore, was *1245 not deficient, and McWhorter did not suffer prejudice. As such, this claim is denied.”
(C. 1181-87.)
The circuit court’s findings are supported by the record and law. McWhorter’s claim that his attorneys failed to adequately present mitigating evidence is essentially a claim that his attorneys should have presented more mitigating evidence. As this Court has stated:
“ ‘ “[F]ailure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing can constitute ineffective assistance of counsel under the Sixth Amendment.” Coleman [v. Mitchell ], 244 F.3d [533] at 545 [ (6th Cir.2001) ]; see also Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Our circuit’s precedent has distinguished between counsel’s complete failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel’s failure to conduct an adequate investigation where the presumption of reasonable performance is more difficult to overcome:
“ ‘ “[T]he cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have totally failed to conduct such an investigation. In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner’s dissatisfaction with the degree of his attorney’s investigation, the presumption of reasonableness imposed by Strickland will be hard to overcome.”
“ ‘Campbell v. Coyle, 260 F.3d 531, 552 (6th Cir.2001) (quotation omitted); see also Moore v. Parker, 425 F.3d 250, 255 (6th Cir.2005). In the present case, defense counsel did not completely fail to conduct an investigation for mitigating evidence. Counsel spoke with Beuke’s parents prior to penalty phase of trial (although there is some question as to how much time counsel spent preparing Beuke’s parents to testify), and presented his parents’ testimony at the sentencing hearing. Defense counsel also asked the probation department to conduct a presentence investigation and a psychiatric evaluation. While these investigatory efforts fall far short of an exhaustive search, they do not qualify as a complete failure to investigate. See Martin v. Mitchell, 280 F.3d 594, 613 (6th Cir.2002) (finding that defense counsel did not completely fail to investigate where there was “limited contact between defense counsel and family members,” “counsel requested a presentence report,” and counsel “elicited the testimony of [petitioner’s] mother and grandmother”). Because Beuke’s attorneys did not entirely abdicate their duty to investigate for mitigating evidence, we must closely evaluate whether they exhibited specific deficiencies that were unreasonable under prevailing professional standards. See Dickerson v. Bagley, 453 F.3d 690, 701 (6th Cir.2006).’
“Beuke v. Houk, 537 F.3d 618, 643 (6th Cir.2008). ‘[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying heavy measure of deference to counsel’s judgments.’ Wiggins, 539 U.S. at 521-22. ‘A defense attorney is not required to investigate all leads.... ’ Bolender v. Singletary, 16 F.3d 1547, *1246 1557 (11th Cir.1994). ‘A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance.’ Atkins v. Singletary, 965 F.2d 952, 960 (11th Cir.1992). ‘The attorney’s decision not to investigate must not be evaluated with the benefit of hindsight, but accorded a strong presumption of reasonableness.’ Mitchell v. Kemp, 762 F.2d 886, 889 (11th Cir.1985).
“ ‘The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.’
“Strickland v. Washington, 466 U.S. at 691. ‘The reasonableness of the investigation involves “not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.” ’ St. Aubin v. Quarterman, 470 F.3d 1096, 1101 (5th Cir.2006), quoting in part Wiggins, 539 U.S. at 527.”
Ray, 80 So.3d at 984. In addition,
“ ‘[W]e “must recognize that trial counsel is afforded broad authority in determining what evidence will be offered in mitigation.” State v. Frazier (1991), 61 Ohio St.3d 247, 255, 574 N.E.2d 483. We also reiterate that post-conviction proceedings were designed to redress denials or infringements of basic constitutional rights and were not intended as an avenue for simply retrying the case. [Laugesen ] v. State, [ (1967), 11 Ohio Misc. 10, 227 N.E.2d 663]; State v. Lott, [ (Nov. 3, 1994), Cuyahoga App. Nos. 66338, 66389, 66390]. Further, the failure to present evidence which is merely cumulative to that which was presented at trial is, generally speaking, not indicative of ineffective assistance of trial counsel. State v. Combs (1994), 100 Ohio App.3d 90, 105, 652 N.E.2d 205.’
“Jells v. Mitchell, 538 F.3d 478, 489 (6th Cir.2008).
“ ‘ “[C]ounsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel’s strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively.” Haliburton v. Sec’y for the Dep’t of Corr., 342 F.3d 1233, 1243-44 (11th Cir.2003) (quotation marks and citations omitted); see Herring v. Sec’y, Dep’t of Corr., 397 F.3d 1338, 1348-50 (11th Cir.2005) (rejecting ineffective assistance claim where defendant’s mother was only mitigation witness and counsel did not introduce evidence from hospital records in counsel’s possession showing defendant’s brain damage and mental retardation or call psychologist who evaluated defendant pre-trial as having dull normal intelligence); Hubbard v. Haley, 317 F.3d 1245, 1254 n. 16, 1260 (11th Cir.2003) (stating this Court has “consistently held that there is ‘no absolute duty ... to introduce mitigating or character evidence’ ” and rejecting claim that counsel were ineffective in failing to present hospital records showing defendant was in “borderline mentally retarded range”) (brackets omitted) (quoting Chandler [v. United States ], 218 F.3d [1305] at 1319 [(11th Cir.2000) ]).’
*1247 “Wood v. Allen, 542 F.3d 1281, 1306 (11th Cir.2008). ‘The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy.’ Hill v. Mitchell, 400 F.3d 308, 331 (6th Cir.2005).”
Dunaway, — So.3d at —.
Likewise,
“‘When claims of ineffective assistance of counsel involve the penalty phase of a capital murder trial the focus is on “whether ‘the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.”’ Jones v. State, 753 So.2d 1174, 1197 (Ala.Crim.App.1999), quoting Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir.1992). See also Williams v. State, 783 So.2d 108 (Ala.Crim.App.2000). An attorney’s performance is not per se ineffective for failing to present mitigating evidence at the penalty phase of a capital trial. See State v. Rizzo, 266 Conn. 171, 833 A.2d 363 (2003); Howard v. State, 853 So.2d 781 (Miss.2003), cert. denied, 540 U.S. 1197 (2004); Battenfield v. State, 953 P.2d 1123 (Okla.Crim.App.1998); Conner v. Anderson, 259 F.Supp.2d 741 (S.D.Ind.2003); Smith v. Cockrell, 311 F.3d 661 (5th Cir.2002); Duckett v. Mullin, 306 F.3d 982 (10th Cir.2002), cert. denied [538 U.S. 1004], 123 S.Ct. 1911 (2003); Hayes v. Woodford, 301 F.3d 1054 (9th Cir.2002); and Hunt v. Lee, 291 F.3d 284 (4th Cir.), cert. denied, 537 U.S. 1045 (2002).’
“Adkins v. State, 930 So.2d 524, 536 (Ala.Crim.App.2001) (opinion on return to third remand). As we also stated in McWilliams v. State, 897 So.2d 437, 453-54 (Ala.Crim.App.2004):
“ ‘ “Prejudicial ineffective assistance of counsel under Strickland cannot be established on the general claim that additional witnesses should have been called in mitigation. See Briley v. Bass, 750 F.2d 1238, 1248 (4th Cir.1984); see also Bassette v. Thompson, 915 F.2d 932, 941 (4th Cir.1990). Rather, the deciding factor is whether additional witnesses would have made any difference in the mitigation phase of the trial.” Smith v. Anderson, 104 F.Supp.2d 773, 809 (S.D.Ohio 2000), aff'd, 348 F.3d 177 (6th Cir.2003). “There has never been a case where additional witnesses could not have been called.” State v. Tarver, 629 So.2d 14, 21 (Ala.Crim.App.1993).’ ”
Hunt v. State, 940 So.2d 1041, 1067-68 (Ala.Crim.App.2005).
In this case, the trial court found that the evidence McWhorter offered at the postconviction evidentiary hearing was either inconsistent with the “good boy, wrong crowd” theory or would have been cumulative to evidence already offered during the penalty phase. In State v. Gamble, 63 So.3d 707 (Ala.Crim.App.2010), a case on which McWhorter relies, this Court specifically distinguished both types of cases:
“This is not a case in which the omitted mitigating evidence was cumulative to evidence that was presented, see Ferguson v. State, 13 So.3d 418 (Ala.Crim.App.2008), or in which counsel investigated and made an informed strategic decision not to present evidence concerning Gamble’s upbringing, see Waldrop v. State, 987 So.2d 1186 (Ala.Crim.App.2007). Here, counsel’s investigation was so inadequate that they failed to discover any mitigation evidence to present at the penalty phase — although the *1248 Rule 32 evidentiary hearing clearly showed that there was a plethora of evidence that could have been presented on Gamble’s behalf.”
Gamble, 63 So.3d at 721.
In two sentences in McWhorter’s brief to this Court, citing Gamble, he also claims error because his trial counsel failed to hire a mitigation specialist. (McWhorter’s brief, p. 52.) Gamble, however, is distinguishable from this case in regard to the hiring of a mitigation investigator. In Gamble, counsel failed to present any mitigation evidence during the penalty phase. 63 So.3d at 721. In this case, counsel conducted an interview with McWhorter and his family, presented the testimony of four witnesses, and hired a neuropsychologist to evaluate McWhorter for any mental disease or disorder.
Moreover, although the evidence about McWhorter’s childhood is indeed disturbing, it does not necessarily mean that trial counsel was ineffective for failing to offer the additional evidence. This Court in Davis v. State, 44 So.3d 1118 (Ala.Crim.App.2009), stated the following in evaluating a similar claim alleging the ineffective assistance of counsel:
“ ‘As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias.’ Bergmann v. McCaughtry, 65 F.3d 1372,1380 (7th Cir.1995).
“ ‘Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are “virtually unchallengeable.” [Strickland v. Washington, 466 U.S. 668] at 690, 104 S.Ct. 2052 [ (1984) ]. Tactical or reasonable professional judgments are not deficient but a failure to investigate a material matter due to inattention may be deficient. When the claim is that counsel failed to present a sufficient mitigating case during sentencing, the inquiry “is not whether counsel should have presented a mitigation case” but “whether the investigation supporting counsel’s decision not to introduce mitigating evidence ... was itself reasonable.” See Wiggins [v. Smith], 539 U.S. [510] at 523, 123 S.Ct. 2527 [ (2003) ] (internal citations omitted).’
“Powell v. Kelly, 562 F.3d 656, 670 (4th Cir.2009). See also Villegas v. Quarterman, 274 Fed.Appx. 378, 382 (5th Cir.2008). Evidence of a difficult childhood has been characterized as a ‘double-edged’ sword. See Bacon v. Lee, 225 F.3d 470, 481 (4th Cir.2000). ‘[Emphasizing a client’s deprived childhood does not have a very beneficial impact on a northwest Florida jury, given the fact that many jurors have had difficult lives, but have not turned to criminal conduct.’ Card v. Dugger, 911 F.2d 1494, 1511 (11th Cir.1990). What one juror finds to be mitigation another juror may find aggravating. ‘[M]itigation may be in the eye of the beholder.’ Stanley v. Zant, 697 F.2d 955, 969 (11th Cir.1983). See also Ford v. Schofield, 488 F.Supp.2d 1258, 1346 (N.D.Ga.2007) (‘The Supreme Court has stated that the reasonableness of counsel’s actions should be evaluated based on “strategic choices made by the defendant and on information supplied by the defendant.” Burger v. Kemp, 483 U.S. 776, 795, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)....’); Carroll v. State, 815 So.2d 601, 615 (Fla.2002) (‘By failing to respond to counsel’s requests to provide trial counsel with the names of witnesses who could assist in presenting mitigating evidence, Carroll may not now complain that trial counsel’s failure to pursue such mitigation was unreasonable.’); Rose v. State, 617 So.2d 291, 295 (Fla.1993) (‘In light of the harmful testi *1249 mony that could have been adduced from Rose’s brother and the minimal probative value of the cousins’ testimony, we are convinced that the outcome would not have been different had their testimony been presented at the penalty phase.’).
“Copeland testified that he made a strategic decision to rely on a plea for mercy. It is clear from both attorneys’ testimony that they conducted an investigation and were aware of Davis’s background and upbringing. Copeland stated that he did not believe evidence of Davis’s performance in school would have had any value because of the nature of the murders. Based on the unique circumstances presented in this case we cannot say that counsel’s actions were unreasonable. Moreover, the testimony at the evidentiary hearing was neither strong nor compelling. Davis was over the age of 25 at the time of the murders. One of Davis’s brothers who testified at the postconviction proceedings was 14 years of age at the time of Davis’s trial. Another brother who testified was in prison at the time of Davis’s trial. Davis’s mother painted a different picture of Davis’s childhood than did Davis’s siblings. Many witnesses admitted that they knew that Davis was selling drugs from his home in Gibbs Village. Other witnesses had not seen Davis for many years. The testimony offered at the postconviction hearing would have been entitled to little weight.”
Davis, 44 So.3d at 1141-42.
Furthermore, this is not a situation where McWhorter’s trial counsel conducted no investigation like counsel in Porter v. McCollum, 130 S.Ct. 447, 453-54 (2009), where counsel failed to uncover evidence of the defendant’s mental health, family background, and serious drinking problem and did not obtain certain records; or like counsel in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), where counsel had information that alluded to the defendant’s troubled and difficult childhood but failed to conduct a more thorough investigation; or like counsel in Williams v. Taylor, 529 U.S. 362,120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), where counsel did not begin to investigate mitigation evidence until a week before trial and failed to uncover critical records about the defendant.
Given the particularly egregious facts of the underlying crime — for example, McWhorter’s planning the crime for three weeks, lying in wait for several hours, and methodically creating homemade silencers and test-firing them beforehand, etc. — and given that McWhorter admitted to much of the crime, McWhorter has failed to demonstrate that his attorneys rendered ineffective assistance by not offering the additional evidence described above. Evidence of a difficult childhood and drug and alcohol abuse is a two-way street. Such evidence can be helpful in mitigation but it can also be harmful to the defense’s case. Additionally, given the methodical, deliberate manner in which McWhorter committed the crime, expert testimony indicating that McWhorter had difficulty in preventing impulsive decisions would not have made any difference. Accordingly, we find no error in the circuit court’s conclusion that counsel’s performance was not deficient.
D.
McWhorter also argues that the circuit court erred in finding that trial counsel’s performance did not prejudice him. He contends that if evidence of the physical abuse he suffered, the violence to which he was exposed, his sniffing gasoline and freon from a young age, and his emotional *1250 State in the period preceding the crime, had been presented to the trial court, he might have been sentenced to life imprisonment without parole.
In assessing claims of ineffective assistance of counsel in the penalty phase of a capital trial, we apply the standard discussed in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003):
“In Strickland [v. Washington, 466 U.S. 668 (1984) ], we made clear that, to establish prejudice, a ‘defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ Id., at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.”
539 U.S. at 534.
In sentencing McWhorter to death, the trial court found one aggravating circumstance — that the capital offense was committed while McWhorter was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit a robbery. See § 13A-5-49(4), Ala.Code 1975. Here, the circuit court found that the omitted mitigating evidence presented at the postcon-viction evidentiary hearing would not have outweighed the aggravating circumstance. This Court has also reviewed the mitigating evidence trial counsel allegedly failed to discover and present against the aggravating circumstances presented. After a complete review, we are confident that the mitigating evidence presented at the post-conviction hearing — but omitted from the penalty phase of McWhorter’s capital-murder trial — would have had no impact on the sentence in this case. See Wiggins, 539 U.S. at 534. Consequently, McWhorter was due no relief on his claim that his trial counsel was ineffective for not presenting the additional mitigating evidence in the penalty phase of his capital-murder trial.
III.
McWhorter essentially makes four arguments with regard to the circuit court’s exclusion of the testimony of David Rowland, Janet Vogelsang, and Dr. Ralph Tarter during the postconviction evidentiary hearing. (Claim XII in McWhorter’s amended Rule 32 petition.) First, McWhorter argues that the exclusion of the testimony on hearsay grounds was improper because, he says, the testimony was not hearsay. Second, McWhorter contends that the evidence was “relevant to demonstrate trial counsel’s inadequate investigation” and that “he was entitled to demonstrate what evidence trial counsel should have presented at the penalty phase of [his] trial.” (McWhorter’s brief, p. 75.) Third, McWhorter claims that the exclusion of evidence on hearsay grounds violated his constitutional right to present evidence in his favor. Last, McWhorter asserts that the circuit court erred in excluding evidence pursuant to Rule 32.6, Ala. R.Crim. P.
Initially, we question whether McWhorter preserved his argument with regard to the exclusion of hearsay evidence during both David Rowland’s and Dr. Tarter’s testimony. During Rowland’s testimony the following exchange occurred:
“[POSTCONVICTION COUNSEL]: Did you talk to [McWhorter] about it?
“[David Rowland]: Yes, I did.
“[POSTCONVICTION COUNSEL]: What did you say to him and what did he say to you?
*1251 “[STATE]: Objection to hearsay, what he said outside these proceedings.
“[POSTCONVICTION COUNSEL]: I will withdraw it.”
(R. 365.) After this objection, the State did not make any further hearsay objections while Rowland testified. Thus, McWhorter, by failing to obtain an adverse ruling from the circuit court, did not preserve this argument for review.
The State also did not make any hearsay objections during Dr. Tarter’s testimony. (R. 659-725.) In his brief, McWhorter does not reference any specific adverse ruling of the circuit court during Dr. Tarter’s testimony; rather, McWhorter makes a bare assertion that the circuit court’s “ruling ... had considerable impact on the testimony of Dr. Tarter.” (McWhorter’s brief, p. 74.) It appears that McWhorter is arguing that, because the circuit court excluded a portion of Janet Vogelsang’s testimony, Dr. Tarter’s testimony was limited. The circuit court, however, never expressly limited Dr. Tarter’s testimony on hearsay grounds. It is well settled that “ ‘[i]n the absence of a ruling, a request for a ruling or an objection to the court’s failure to rule, there is nothing preserved for appellate review.’ ” Reynolds v. State, 114 So.3d 61, 108 (Ala.Crim.App.2010) (quoting Johnson v. State, 542 So.2d 341, 345 (Ala.Crim.App.1989) (citations omitted)).
Because McWhorter withdrew his question to David Rowland when the State objected on hearsay grounds and because the State did not object on hearsay grounds during Dr. Tarter’s testimony, there is no ruling from the circuit court that this Court can review for error. Accordingly, any issues McWhorter raises with regard to the exclusion of the testimony of both David Rowland and Dr. Tarter are not preserved for review.
McWhorter also contends that the circuit court improperly excluded the testimony of Janet Vogelsang. During the evi-dentiary hearing the following transpired:
“[POSTCONVICTION COUNSEL]: And were there any activities that you engaged in, in this case as a capital case, that were unique or unusual?
“[Janet Vogelsang]: There were. There was the opportunity in this case to interview some family members with a great deal of space in between. And so that was the opportunity — space of time. So that was an opportunity to look for consistency of information over a longer period of time than usual.
“And the other thing that was unique, I think, about the family history was that on his mother’s side of the family, going back several generations, these people were migrant workers, and they followed the harvest.
“[STATE]: Objection, Your Honor, to hearsay. We would object. We have no idea where this is coming from, this migrant workers. There’s been no testimony that anybody’s been a migrant worker in this case. This is pure hearsay that she is getting from some third party. Under Alabama caselaw, it’s impermissible at a Rule 32 hearing.
“[POSTCONVICTION COUNSEL]: Your Honor, I would say under Rule 703, [Ala. R. Evid.,] under the opinions and testimony of expert witnesses, Ms. Vogelsang as having been qualified as an expert to render her opinions and findings in her biopsychosocial assessment, she may rely upon the facts or data in the particular case upon which an expert bases her opinion, or inference may be those perceived by or made known to the expert at or before the hearing. She has just listed all of the documents that she’s reviewed and the people that *1252 she has interviewed and the persons with whom she’s consulted.
“[STATE]: Your Honor, we have three Rule 32, [Ala. R.Crim. P.,] Court of Criminal Appeals’ cases that stand for the proposition I cited. One actually involves Dr. Vogelsang.
“THE COURT: Let me take a look at it.
“[STATE]: That would be [Giles v. State, 906 So.2d 963 (Ala.Crim.App.2004), Hunt v. State, 940 So.2d 1041 (Ala.Crim.App.2005) ], and the final one is [Waldrop v. State, 987 So.2d 1186 (Ala.Crim.App.2007) ].
[[Image here]]
“[THE COURT]: All right. Tell me how we get around Rule 703, which, to me, looks like a prohibition upon hearsay knowledge coming in, even if it’s relied upon by the expert.
“[POSTCONVICTION COUNSEL]: Tell me how I get around it? Because it is based on her opinion, based on the people that she — as an expert witness, she’s permitted to testify about what she relied upon in basing her—
“[THE COURT]: She is under federal law. Alabama’s rule actually takes the exact opposite of the federal rule, which is that if it’s inadmissible as hearsay, then she cannot testify in her opinion.
“[POSTCONVICTION COUNSEL]: Well, in terms of the hearsay, we do not intend to have Ms. Vogelsang indicate who said anything, who is attributed to this. These are just her impressions and findings that are based upon her interviews. So it’s not hearsay.
“[STATE]: Your Honor, that’s the very definition of hearsay. They’re based on third-party, out-of-court statements. And that’s just a perfect example that this family’s from migrant workers. That’s classic hearsay, some third party told Ms. Vogelsang, and she just came into court to tell me that.
“[THE COURT]: Let me read the statement of the rule. ‘Experts without firsthand knowledge generally may not base opinions upon facts or data that have not themselves been admitted into evidence.’
“[POSTCONVICTION COUNSEL]: And there has been no evidence, Your Honor.
“[THE COURT]: How do we cross that threshold?
“[POSTCONVICTION COUNSEL]: Our copy of [Rule] 703, Your Honor, is different from Your Honor’s.
“[THE COURT]: I’m giving you a statement of the rule.
“[POSTCONVICTION COUNSEL]: May I see it?
“[THE COURT]: Yes.
“[POSTCONVICTION COUNSEL]: Your Honor, can we have a moment to talk about this?
[[Image here]]
“[POSTCONVICTION COUNSEL]: For the record, first, we had earlier objected and taken the position that the rules of evidence, at least as to hearsay, should not apply to the mitigation phase. I understand the Court ruled that they did. We reiterate that objection, just for the record.
“And, second, we submit that we’re entitled to, under the Federal Constitution, to make a full and complete record of all mitigation factors, and that Ms. Vogelsang’s inability and any expert’s inability to testify as to hearsay as an expert, limits that right. And we want to preserve that and object to it on that ground, as well.
*1253 “[THE COURT]: I understand. The objection is sustained.”
(R. 522-27.)
A.
McWhorter first argues that the statement from Vogelsang was not hearsay because it was not being offered for the truth of the matter asserted. (McWhorter’s brief, p. 75.) To support his argument McWhorter cites two cases— Pylant v. State, 263 S.W.Bd 854 (Tenn.2008), and Trimble v. State, 693 S.W.2d 267 (Mo.Ct.App.1985). In both cases the appellate courts reversed the trial courts because they excluded hearsay evidence when it was being offered to show ineffective assistance of counsel because the statements were not being offered for the truth of the matter asserted. McWhorter, however, did not raise this argument in the circuit court. “The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.” Ex parte Frith, 526 So.2d 880, 882 (Ala.1987). Thus, this argument is not properly before this Court for review.
B.
McWhorter also argues, in the alternative, that even if the statement was hearsay “he was entitled to demonstrate what evidence trial counsel should have presented at the penalty phase of [his] trial” because “at the penalty phase the evidence presented could have included hearsay.” (McWhorter’s brief, p. 75.) McWhorter contends that “the law plainly [supports] this argument.” (McWhorter’s brief, p. 75.)
McWhorter correctly asserts that hearsay is admissible during the penalty phase of trial because the rules of evidence do not apply to sentencing hearings. Rule 1101(b)(3), Ala. R. Evid. McWhorter’s argument that the inapplicability of the rules of evidence during a sentencing hearing allows him to present hearsay evidence during a postconviction evidentiary hearing, however, is in direct conflict with Alabama law. See Waldrop v. State, 987 So.2d 1186 (Ala.Crim.App.2007). As this Court stated in Waldrop:
“Waldrop argues that the circuit court erred in excluding hearsay mitigating evidence at his Rule 32 evidentiary hearing. He argues that because hearsay evidence is admissible at a sentencing hearing in a capital-murder trial, it is also admissible at a post-conviction proceeding attacking a death sentence.
“However, Waldrop’s argument is inconsistent with prior cases of this Court. As we stated in Hunt v. State [940 So.2d 1041 (Ala.Crim.App.2005) ]:
“‘The Alabama Rules of Evidence apply to Rule 32 proceedings. Rule 804, Ala. R. Evid., specifically excludes hearsay evidence. We addressed this identical issue in Giles v. State, 906 So.2d 963 (Ala.Crim.App.2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005), and stated:
“ ‘ “Giles specifically argues that the circuit court erroneously failed to consider the hearsay testimony of two witnesses as to what Giles told them about a drug relationship between him and Carl Nelson. Giles argues that the circuit court misapplied the evidentiary rules governing capital sentencing because hearsay evidence is admissible at the sentencing portion of a capital-murder trial.
“ ‘ “However, what Giles fails to consider is whether the Rules of Evidence apply to Rule 32 proceedings. See Rule 101, Ala. R. Evid., and Rule 1101(a), Ala. R. *1254 Evid., which states, in part, ‘these rules of evidence apply in all proceedings in the Courts of Alabama....’ Rule 1101(b), Ala. R. Evid., lists the proceedings exempt from application of the Rules of Evidence. Those proceedings include proceedings concerning preliminary questions of fact, grand jury proceedings, extradition proceedings, preliminary hearings in criminal cases, sentencing or probation revocation hearings, proceedings related to the issuance of a warrant of arrest, criminal summonses, or search warrants, bail proceedings, and contempt proceedings.
“ ‘ “The Rules of Evidence apply to post-conviction proceedings. See DeBruce v. State, 890 So.2d 1068 (Ala.Crim.App.2003). Rule 804, Ala. R. Evid., specifically excludes hearsay evidence. The circuit court correctly applied existing law and excluded the hearsay statements presented concerning an alleged drug relationship between Giles and one of the victims. After excluding the hearsay evidence, the circuit court was left with no lawful evidence to support this contention. Relief was correctly denied on this ground. See DeBruce, supra.”
“ ‘906 So.2d at 985-86. The circuit court committed no error in excluding the affidavits and the hearsay testimony of co-counsel.’ ”
Waldrop v. State, 987 So.2d at 1190. Thus, the rules of evidence apply to post-conviction proceedings, and the circuit court should exclude inadmissible hearsay.
Here, the circuit court determined that the evidence Vogelsang was attempting to base her expert opinion on was inadmissible hearsay, and it sustained the State’s objection. In Alabama, hearsay is defined as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), Ala. R. Evid. Hearsay evidence is inadmissible unless expressly allowed by statute or rule. Rule 802, Ala. R. Evid. The hearsay rules are not completely suspended, however, when an expert witness testifies. The Alabama Supreme Court has held:
“ ‘ “An expert may give his opinion based upon his own knowledge of the facts, stating these facts, then his opinion; or, he may give an opinion based upon a hypothetical question, based upon facts in evidence. In either case, the facts known to the expert or [hypothesized] must be facts in evidence. Blakeney v. Alabama Power Co., 222 Ala. 394, 133 So. 16, 18 (1931).” ’
“Welch v. Houston County Hosp. Bd., 502 So.2d 340, 345 (Ala.1987), quoting Thompson v. Jarrell, 460 So.2d 148, 150 (Ala.1984). (Emphasis added in Welch). See, also, Romine v. Medicenters of America, Inc., 476 So.2d 51 (Ala.1985).”
Ex parte Wesley, 575 So.2d 127, 129 (Ala.1990). In other words, an expert can testify based on hearsay, but only if the hearsay evidence has been admitted during the proceedings. In this case, the evidence McWhorter was attempting to elicit from Vogelsang had not been admitted into evidence; therefore, the circuit court correctly held that the evidence should have been excluded; that ruling is in compliance with both the rules of evidence and Waldrop.
McWhorter contends, however, that Waldrop is in direct conflict with the recent United States Supreme Court ruling in Sears v. Upton, 561 U.S. 945, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010). McWhort *1255 er argues that the cases conflict because Sears holds that
“ ‘[t]he fact that some ... evidence may have been “hearsay” does not necessarily undermine its value — or its admissibility — for penalty phase purposes,’ and that ‘reliable hearsay evidence that is relevant to a capital defendant’s mitigation defense should not be excluded by rote application of a state hearsay rule.’ ”
(McWhorter’s reply, p. 19 (quoting Sears, 561 U.S. at 3263, 130 S.Ct. at 3263).) McWhorter, however, misinterprets Sears.
In Sears, a Georgia court held a hearing on Sears’s postconviction-relief claim of ineffective assistance of counsel. After hearing the testimony presented in the postconviction evidentiary hearing, the Georgia court determined that Sears’s trial counsel was constitutionally inadequate under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), but it could not determine whether the inadequate representation prejudiced Sears. The Supreme Court held that the Georgia court did not properly apply the Strickland test and remanded the case for the court to apply it correctly.
Although McWhorter correctly cites the Supreme Court’s statement regarding the “rote application” of state hearsay rules, that was not the Court’s holding. The Court’s holding was to restate the correct standard for determining ineffective assistance of counsel, not to issue a blanket ruling that hearsay is always admissible in a postconviction hearing. Thus, Waldrop does not conflict with Sears.
Because McWhorter’s argument is foreclosed by this Court’s ruling in Waldrop, the circuit court did not abuse its discretion when it prevented Vogelsang from testifying as to hearsay statements that were not in evidence.
C.
McWhorter next argues that the exclusion of hearsay testimony violated his rights both under the federal and the state constitution. Specifically, McWhorter argues that the exclusion of hearsay statements during his postconviction hearing violated his right to present a complete defense. To support his position McWhorter again cites Sears. Here, McWTiorter contends that Sears stands for the proposition that “hearsay rules cannot be used to exclude evidence during post-conviction hearings in capital cases,” which, he says, is a principle rooted in the “defendant’s well-recognized right under the compulsory process and due process clauses to present witnesses on his own behalf.” (McWhorter’s brief, pp. 77-78.) As stated above, McWhorter misinterprets Sears. Sears does not abrogate state hearsay rules during postconviction hearings; rather, the United States Supreme Court reiterated the Strickland test in Sears and reversed the lower court’s judgment because it failed to properly apply that test.
To further support his argument McWhorter cites Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), which, he says, hold that “the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.” (McWhorter’s brief, p. 78.) McWhorter also cites Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), and Skipper v. South Carolina, 476 U.S. 1,106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), which, he says, hold that a defendant has the “right to place before the sentencer relevant evidence in mitigation of punishment.” (McWhorter’s brief, p. 78.) These cases, however, are also distinguishable from McWhorter’s case.
*1256 In Chambers, a defendant’s request to cross-examine a key witness was denied by the lower court based on a Mississippi common-law rule, which prevented a party from impeaching its own witness. The defendant attempted to call witnesses to testify to what they heard the key witness say; the lower court, however, excluded the testimony on the basis that it was hearsay. The Supreme Court held that the
“testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers’ defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.”
Chambers, 410 U.S. at 302.
In Crane, a defendant sought to introduce testimony about the environment in which the police secured his confession. Part of his defense was to show that because there was no physical evidence tying him to the crime the jury should not believe his confession. To support his defense, he sought to paint a picture of a young, uneducated boy who was kept against his will in a small, windowless room for a long period. The lower court, however, precluded him from putting on any testimony about the environment in which the interrogation took place. The Supreme Court held that a defendant has a meaningful opportunity to present a complete defense, which is an empty opportunity if the State were “permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant’s claim of innocence.” Crane, 476 U.S. at 691.
In Gardner, the defendant was convicted of murder. During the sentencing phase of trial the lower court relied on a presen-tence investigation report to sentence the defendant to death. The report, however, contained confidential information that the lower court did not put in the record during the sentencing hearing. Additionally, the lower court did not disclose the information to the Supreme Court of Florida. The United States Supreme Court held that the record on appeal must disclose to the reviewing court the considerations that motivated a death sentence in every case in which it is imposed. Gardner, 430 U.S. at 362.
In Skipper, the defendant sought to introduce testimony during a sentencing hearing from two jailers and a jail visitor that the defendant “made a good adjustment” while he was in jail. The lower court excluded the evidence because of a state rule that provided that such evidence was irrelevant and inadmissible. The Supreme Court held that in capital cases the sentencer should “not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.” Skipper, 476 U.S. at 4.
Here, although Vogelsang was precluded from testifying as to certain conversations she had with McWhorter’s family members because the statements were hearsay, nothing precluded McWhorter from calling those family members as witnesses at the postconviction proceeding. The circuit court ruled that, as an expert, Vogelsang could not testify to her conclusions drawn from facts and data that were not in evidence. To remedy this, McWhorter simply had to elicit testimony *1257 from the witnesses that would be necessary to put the facts and data into evidence that would allow Vogelsang to provide her complete opinion. This is different from the situations presented in Chambers, Crane, Gardner, and Skipper, where the lower courts precluded the defendants from putting on any evidence with regard to their respective defenses. The burden of presenting the evidence necessary to entitle a petitioner to postconviction relief rests squarely on the petitioner. See Rule 32.3, Ala. R.Crim. P. Because McWhorter did not put on all the witnesses needed to meet his burden, the circuit court did not infringe on his right to present a complete defense.
D.
Finally, McWhorter argues that the circuit court erred in excluding evidence under Rule 32.6(b). Specifically, McWhorter contends that “Rule 32.6(b) is a pleading rule, not an evidentiary rule; it cannot provide the basis for exclusion of evidence.” (McWhorter’s brief, p. 81.) He claims error because, he says, the circuit court limited the testimony of Abraham Barnes and Amy Battle, McWhorter’s high-school friends, and Kenneth Burns, McWhorter’s middle-school science teacher.
Our review of the record indicates that the circuit court did not exclude evidence based on Rule 32.6(b). Instead, the circuit court limited the testimony of the complained-of witnesses to the allegations contained in the amended Rule 32 petition. Specifically, the court ruled that the witnesses, even though not identified in the petition, could testify as to the assertions in the amended petition. Thus, the record refutes McWhorter’s claim on this basis. Consequently, McWhorter is not entitled to relief on this assertion of error.
IV.
McWhorter argues that the circuit court erred in summarily dismissing his Brady claim because, he says, the State failed to disclose potentially exculpatory evidence that was relevant to mitigation. (Claim VT(A) in McWhorter’s amended Rule 32 petition.) Specifically, McWhorter alleged that the State withheld information that “a jailhouse informant named Timothy Rice told the State’s prosecutors that both McWhorter and his then-co-defendant, Daniel Miner, said that McWhorter had shot the victim, Lee Williams[,] once in the leg, and Miner fired the remaining shots, including the shots that killed Williams.” (McWhorter’s brief, pp. 84-85.) [15] This claim was not sufficiently pleaded, and it was procedurally barred because it could have been raised at trial and on appeal but was not. See Rule 32.3, Ala. R.Crim. P.; Rule 32.2(a)(3), (a)(5), Ala. R.Crim. P.
In McWhorter’s amended petition, he alleged the following:
“80. Despite the heightened obligation upon the State in this capital proceeding, despite a specific request from defense counsel, and despite the fact that the defense requested and the trial judge granted open file discovery, the State failed to provide exculpatory evidence in its possession to the defense. *1258 District Attorney Thompson failed to disclose to defense counsel that less than two months earlier, on January 19, 1994, Assistant District Attorney Jolley took a statement from Timothy Rice, who at that time was incarcerated in the Marshall County Jail along with Mr. McWhorter and his codefendants. In exchange for his statement, Mr. Jolley offered Mr. Rice immunity from prosecution on any illegal activities revealed in his statement, so long as those activities did not implicate Mr. Rice in a crime of violence. Mr. Rice informed Mr. Jolley that he had talked separately with Mr. McWhorter, Mr. Miner, and Mr. Lee Williams, Jr., about what happened on the night of the crime. In their separate conversations with Mr. Rice, both Mr. McWhorter and Mr. Miner stated that Mr. McWhorter shot Mr. Williams once in the leg, but that Mr. Miner fired the rest of the shots, including the shots that actually killed Mr. Williams. This information was never disclosed to defense counsel. If the District Attorney had disclosed this information to defense counsel, it would have provided persuasive support for Mr. McWhorter’s defense theory that Mr. Miner, and not Mr. McWhorter, was the primary shooter, and that Mr. McWhorter did not intend to murder Mr. Williams.”
(C. 503.)
As this Court said in Ray, 80 So.3d at 973:
“The United States Supreme Court in Brady held that ‘the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution.’ 373 U.S. at 87. ‘To establish a Brady violation, [the petitioner] must demonstrate: (1) that the prosecution suppressed evidence; (2) that that evidence was favorable to [the defendant] or exculpatory; and (3) that the evidence was material.’ Ex parte Kennedy, 472 So.2d 1106,1110 (Ala.1985).”
The State asserted below, as it does now on appeal, that summary dismissal of McWhorter’s Rule 32 petition was proper because McWhorter failed to assert that he could not have raised his Brady claim at trial or on direct appeal. See Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P. The State also argued that McWhorter’s Brady claim was insufficiently pleaded and therefore was procedurally barred pursuant to Rule 32.7(d). The circuit court summarily dismissed McWhorter’s Brady claim regarding Rice’s alleged statement pursuant to Rule 32.7(d). (C. 865,1126.)
In considering a similar claim in Beckworth v. State, [Ms. CR-07-0051, May 1, 2009] — So.3d —(Ala.Crim.App.2009), that the prosecutor had committed a Brady violation, this Court said:
“Rule 32.3 states that ‘[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.’ Rule 32.6(b) states that ‘[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.’ In Boyd v. State, 913 So.2d 1113, 1125 (Ala.Crim.App.2003), this Court stated:
“ ‘ “Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.” Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other *1259 words, it is not the pleading of a conclusion “which, if true, entitle[s] the petitioner to relief.” Lancaster v. State, 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R.Crim. P., to present evidence proving those alleged facts.’
“In Hyde v. State, 950 So.2d 344 (Ala.Crim.App.2006), this Court recognized:
“ ‘The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So.2d 724 (Ala.Crim.App.2003).’
“Hyde v. State, 950 So.2d at 356.”
Beckworth, — So.3d at —.
“ ‘Because this Brady claim was first presented in a Rule 32 petition, [McWhorter] can obtain relief only if it involves “newly discovered evidence.” ’ Payne v. State, 791 So.2d 383, 397 (Ala.Crim.App.1999). See also Windsor v. State, 89 So.3d 805, 825 (Ala.Crim.App.2009) (Windsor did not allege that his Brady claims were based on newly discovered evidence or that any alleged suppression by the State continued until such time as the claims could not have been raised at trial.’); Bush v. State, 92 So.3d 121, 149 (Ala.Crim.App.2009) (‘[BJecause this alleged Brady violation is raised in a postconviction petition, the petitioner must also satisfy the requirements for newly discovered evidence.’); Davis v. State, 44 So.3d 1118, 1144 (Ala.Crim.App.2009) (‘Davis failed to plead and to prove the requirements for newly discovered evidence.’).”
Ray, 80 So.3d at 973.
Rule 32.1(e) allows a petitioner to institute a Rule 32 proceeding on the grounds that “newly discovered material facts exist which require that the conviction or sentence be vacated by the court” if:
“(1) The facts relied upon were not known by the petitioner or the petitioner’s counsel at the time of trial or sentencing or in time to file a posttrial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;
“(2) The facts are not merely cumulative to other facts that were known;
“(3) The facts do not merely amount to impeachment evidence;
“(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and
“(5) The facts establish that the petitioner is innocent of the crime for which the petitioner was convicted or should not have received the sentence that the petitioner received.”
Rule 32.1(e), Ala. R.Crim. P.
A postconviction Brady claim raised in a Rule 32 petition must meet all five prerequisites of “newly discovered evidence” in Rule 32.1(e), Ala. R.Crim. P. Payne v. State, 791 So.2d 383, 398 (Ala.Crim.App.1999). Numerous recent opin *1260 ions of this Court have held that a petitioner’s Rule 32 Brady claim is procedurally barred if the petitioner fails to plead that his claim is based on newly discovered evidence and could not have been raised at trial or on direct appeal. See, e.g., Bryant v. State, [Ms. CR-08-0405, Feb. 4, 2011] — So.3d —(Ala.Crim.App.2011); Ray, supra; Davis, supra; Windsor, supra; Beckworth, supra; Smith v. State, 71 So.3d 12 (Ala.Crim.App.2008); Ferguson v. State, 13 So.3d 418, 444-45 (Ala.Crim.App.2008).
In this case, McWhorter failed to include in his petition any facts indicating that the State’s alleged suppression of Rice’s statement taken two months before trial continued until such time as the claim could not have been raised in a posttrial motion or on appeal. Thus, he has failed to plead sufficient facts to support his claim for relief, and the claim is procedurally barred because it could have been, but was not, raised at trial or on appeal.
In Hunt v. State, 940 So.2d 1041, 1058 (Ala.Crim.App.2005), this Court, in considering the petitioner’s claim that the State had committed a Brady violation, held:
“[T]he circuit court found that Hunt’s Brady claim was precluded because Hunt failed to plead or to prove that this claim was based on newly discovered evidence. The circuit court’s ruling is consistent with prior holdings of this Court. As we stated in Williams v. State, 782 So.2d 811, 818 (Ala.Crim.App.2000):
“ ‘The appellant’s first argument is that the State withheld exculpatory information in violation of Brady v. Maryland, 373 U.S. 83 (1963).... The appellant did not assert that this claim was based on newly discovered evidence. Therefore, it is procedurally barred because he could have raised it at trial and on direct appeal, but did not. See Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P.; Boyd v. State, 746 So.2d 364 (Ala.Cr.App.1999); Matthews v. State, 654 So.2d 66 (Ala.Cr.App.1994); Lundy v. State, 568 So.2d 399 (Ala.Cr.App.1990).’ ”
See also Madison v. State, 999 So.2d 561 (Ala.Crim.App.2006) (a postconviction Brady claim raised in a Rule 32 petition must meet the prerequisites of newly discovered evidence set forth in Rule 32.1(e), Ala. R.Crim. P.). Because McWhorter did not allege any facts in his Rule 32 petition indicating when he learned of the existence of Rice’s alleged statement or indicating that the discovery of the statement did not occur until after the time for filing a motion for a new trial or an appeal had lapsed, the claim was insufficiently pleaded, and it is procedurally barred. Therefore, summary dismissal of this Brady claim was proper under Rule 32.7(d).
McWhorter cites Ex parte Pierce, 851 So.2d 606 (Ala.2000), and McGahee v. State, 885 So.2d 191 (Ala.Crim.App.2003), for the proposition that the newly-discovered-evidence standard of Rule 32.1(e) does not apply to Rule 32 claims based on alleged violations of the defendant’s constitutional rights. McWhorter’s argument is misplaced because his Brady claim is procedurally barred. In Pierce, the Alabama Supreme Court held that Rule 32.1(e) did not apply to a juror-misconduct claim because the petitioner’s claim was a constitutional claim under Rule 32.1(a). The Court, however, went on to State that “[although Rule 32.1(e) does not preclude Pierce’s claim, Rule 32.2(a)(3) and (5) would preclude Pierce’s claim if it could have been raised at trial or on appeal.” Pierce, 851 So.2d at 614. The Court stated that Pierce’s claim was barred under Rules 32.2(a)(3) and 32.2(a)(5) unless “he *1261 established that the information [forming the basis of his claim] was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal.” Pierce, 851 So.2d at 616. Thus, although McWhorter does not have to prove that his Brady claim is based on “newly discovered material facts” as defined under Rule 32.1(e)(1) — (5), he must still plead facts indicating that his claim could not have been raised at trial or on direct appeal to avoid being procedurally barred under Rule 82.2(a)(8) and 32.2(a)(5).[16] This requires McWhorter to plead that the State’s alleged concealment of Rice’s statement “was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal.” Pierce, 851 So.2d at 616. See also Hunt, supra, Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003), and Windsor v. State, 89 So.3d 805 (Ala.Crim.App.2009).
Finally, McWhorter also appears to argue that his Brady rights supersede the procedural requirements of Rule 32. Hunt, Boyd, Windsor, as well as other cases have all subjected Brady claims to Rule 32’s procedural requirements. To prove that Rule 32’s procedural requirements are unconstitutional, McWhorter would have to prove that Rule 32 “is fundamentally inadequate to vindicate the substantive rights involved.” District Attorney’s Office of the Third Judicial District v. Osborne, 557 U.S. 52, 53, 129 S.Ct. 2308, 2320, 174 L.Ed.2d 38 (2009). McWhorter does not make this argument in his brief.
McWhorter’s Brady claim was not pleaded with sufficient specificity and lacked a full disclosure of the factual basis supporting the claim. Summary dismissal of the claim would have been proper, additionally, because the claim could have been raised at trial or on appeal, but was not, and thus was procedurally barred. McWhorter clearly failed to show that he was entitled to relief.
V.
Lastly, McWhorter argues that counsel was ineffective for failing to object to his being transported in and out of the courtroom in the presence of the jury in handcuffs. (Claim VIII in McWhorter’s amended Rule 32 petition.) McWhorter contends that the circuit court erred in dismissing his petition without an eviden-tiary hearing. He alleges that this claim was sufficiently pleaded and is meritorious on its face. Thus, McWhorter argues, he was entitled to an evidentiary hearing on this issue.
In his amended petition, McWhorter alleged as follows in regard to this claim:
“96. On each day of the trial, the jurors could see [McWhorter] being led into the courtroom manacled, in handcuffs. Jurors could see [McWhorter’s] handcuffs being put on and removed.
“97. Trial counsel never objected to this procedure.
“98. The shackling procedure stripped [McWhorter] of the presumption of innocence that is constitutionally afforded to all defendants. One of the ‘basic components of a fair trial is the presumption of innocence.’ Estelle v. Williams, 425 U.S. 501, 503 (1976). ‘To *1262 implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process.’ Id. Shackling tends not only to undermine the defendant’s presumption of innocence, but ‘is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.’ Illinois v. Allen, 397 U.S. 337, 344 (1970).
“99. ‘All of the authorities we have studied are agreed that to bring a prisoner before the bar of justice in handcuffs or shackles, where there is no pretense of necessity, is inconsistent with our notion of a fair trial, for it creates in the minds of the jury a prejudice which will likely deter them from deciding the prisoner’s fate impartially.’ Clark v. State, 195 So.2d 786, 787 (Ala.1967).
“100. When shackling occurs, it must be subjected to ‘close judicial scrutiny,’ to determine if there was an ‘essential state interest’ furthered by compelling a defendant to wear shackles and whether less restrictive, less prejudicial methods of restraint were considered or could have been employed. Elledge v. Dugger, 823 F.2d 1439, 1451 (11th Cir.1987) (citations omitted). Although ‘[Gjreat weight must be accorded the discretion of the trial court’ in determining what security measures are necessary, constitutional limits must be maintained, Goodwin v. State, 495 So.2d 731, 733 (Ala.Crim.App.1986), by balancing the state interest in security with the potential for prejudice to the defendant.
“101. [McWhorter] posed no risk to justify his being shackled throughout his trial. His behavior was neither boisterous nor recalcitrant. In fact, he sat quietly throughout the proceedings. He made no threats at any point during the trial, or leading up to it, and there was therefore no persuasive reason why handcuffs could not be removed before he entered the courtroom, or why he could not have been permitted to exit the courtroom without being shackled.
“102. The decision to exhibit [McWhorter] in shackles, each day of the trial, was an uninformed one, and made without considering less-restrictive security measures. It violated [McWhorter’s] rights to due process, a fair trial, and a reliable sentencing protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law.
“103. By failing to object to the shackling procedure, or to make an appropriate record, trial counsel not only failed to preserve the issue for consideration on direct appeal, they also failed to measure up to an objective standard of reasonableness in their representation of [McWhorter], in that they permitted the fairness of the trial to be undermined and compromised, and permitted [McWhorter’s] Alabama and Federal Constitutional rights to be violated as set forth above, without any strategic reason for acting as they did.”
(C. 509-10.)
Judge Evans summarily dismissed the claim pursuant to Rule 32.7(d), Ala. R.Crim. P. Judge Burke stated as follows in the final order denying McWhorter’s amended petition:
“Judge Evans’s order of October 19, 2006, did not specify why this claim failed to state a material issue of fact or law, in violation of Rule 32.7(d). McWhorter alleges that jurors saw him led to the courtroom wearing handcuffs and that trial counsel did not object. McWhorter does not plead specifically how this prejudiced him, so this claim *1263 fails to meet Rule 32.6(b)’s ‘clear and specific’ pleading requirement. Also, this Court holds that McWhorter cannot show prejudice because ‘it is not ground for mistrial that the accused appeared before the jury in handcuffs when his appearance was only part of going to and from the courtroom.’ Dunaway v. State, [Ms. CR-06-0996, Dec. 18, 2009] — So.3d-(Ala.Crim.App.2009) (affirming the dismissal of Dunaway’s substantially similar [ineffective assistance of counsel] claim for failure to object where testimony at Dunaway’s Rule 32 hearing only showed that an alternate juror saw the handcuffs).”
(C. 866, 1128.)
In order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that “counsel’s performance was deficient” and that this deficiency was so severe that the defendant was deprived of a fair trial. Strickland, 466 U.S. at 687. “The defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” 466 U.S. at 694.
In Alabama, it has consistently been held that
“ ‘[bjringing a prisoner before the bar of justice in handcuffs or shackles, where there is no pretense of necessity, is inconsistent with our notion of a fair trial.’ Brock v. State, 555 So.2d 285, 288 (Ala.Crim.App.1989), on return to remand, 580 So.2d 1390 (Ala.Crim.App.1991). The decision to restrain a defendant rests with the trial judge, and, absent an abuse of discretion, this Court will not disturb his ruling on appeal. Id. at 289. ‘Ultimately, however, it is incumbent upon the defendant to show that less drastic alternatives were available and that the trial judge abused his discretion by not implementing them.’ Id. (internal citation and quotation marks omitted). ‘It is not always reversible error for a defendant to be handcuffed or shackled in front of the jury.’ Perkins v. State, 808 So.2d 1041, 1079 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143,1145 (Ala.2001).”
McCall v. State, 833 So.2d 673, 676 (Ala.Crim.App.2001) (holding that, although the trial judge failed to state his reasons for requiring an inmate witness to testify in shackles and prison clothing, defendant failed to show that he had suffered any prejudice). See also Brock v. State, 555 So.2d 285, 289 (Ala.Crim.App.1989) (holing that, although the facts of that case did not “explicitly indicate a fear by the court that the defendant would attempt to escape, it is not reversible error for a trial court to allow a defendant to be brought into the courtroom handcuffed”). “ ‘It is not ground for mistrial that the accused appeared before the jury in handcuffs when his appearance was only a part of going to and from the courtroom.’ ” Justo v. State, 568 So.2d 312, 318 (Ala.Crim.App.1990) (quoting Cushing v. State, 455 So.2d 119, 121 (Ala.Crim.App.1984)). Whether a defendant may be handcuffed for purposes of being taken to and from the courtroom is left to the discretion of the trial court. McWilliams v. State, 640 So.2d 982 (Ala.Crim.App.1991).
We affirm the circuit court’s dismissal of the claims. McWhorter has not presented any facts to support this claim; the claim is based on bare assertions and conclusions. Consequently, McWhorter has not met either the burden of pleading imposed by Rule 32.3 or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P. McWhorter has not shown that trial counsel’s performance was outside “the *1264 wide range of reasonable professional assistance,” Strickland, 466 U.S. at 689, 104 S.Ct. 2052, nor has' McWhorter shown that there is a reasonable probability that, if trial counsel had made an objection to the handcuffs, the result of the trial would have been different. Accordingly, summary dismissal of this claim was proper.
Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
WELCH, P.J., and KELLUM, J., concur. WINDOM and BURKE, JJ., recuse themselves.

. This case was originally assigned to another member of this Court. It was reassigned to Judge Joiner on March 1, 2011, and was orally argued on May 17, 2011.

. Judge William C. Gullahorn, Jr., presided over McWhorter’s capital-murder trial. McWhorter's Rule 32 petition and amended petition were assigned to Judge David Evans. As indicated in the main opinion, Judge Evans granted the State's motion for partial summary dismissal, dismissing certain claims of McWhorter’s amended petition. Judge Evans subsequently retired in early 2007. The case remained stagnant until Judge Liles C. Burke, then a Marshall County district court judge, was specially appointed to preside in the summer of 2008.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. We are using initials to protect the anonymity of the jurors.

. McWhorter’s postconviction evidentiary hearing Exhibit No. 1. (R. 42-43.)

.McWhorter's materials to this Court refer to this interview as the "triple interview.”

. "Huffing” is inhaling volatile substances for their intoxicating effect.

. Barnes explained that "roulette" was where they would put a bullet in the chamber of a gun, spin it, put the gun to their heads, and pull the trigger. (R. 510.)

. McWhorter relies on Ex parte Dixon, 55 So.3d 1257 (Ala.2010). Ex parte Dixon, however, is distinguishable from this case, and McWhorter’s reliance on it is misplaced. In Ex parte Dixon, the Alabama Supreme Court applied the Ex parte Dobyne, 805 So.2d 763 (Ala.2001), factors and concluded that "the trial court exceeded its discretion in denying Dixon's motion for a new trial based on [juror] L.A.'s failure to disclose in response to a question on voir dire that criminal charges were pending against her.” 55 So.3d at 1261. It further held that most of the factors indicated "that Dixon was prejudiced by [juror] L.A.’s failure to respond.” Id.
In Ex parte Dixon, the trial court did not make any written findings of fact or indicate on the record its basis for its decision to deny Dixon's motion for a new trial as to juror L.A.'s failure to respond to a voir dire question. 55 So.3d at 1260. In this case, however, the circuit court considered the Dobyne factors and entered a detailed order explaining why Juror L.B.’s "role as a juror likely was not affected by her father's death.” (C. 1137-39.)

. Rule 606(b) of the Alabama Rules of Evidence provides:
"(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror’s affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. Nothing herein precludes a juror from testifying in support of a verdict or indictment."

. In Taite v. State, 48 So.3d 1 (Ala.Crim.App.2009), a juror's statement during deliberations that the defendant had been previously incarcerated was considered prejudice as a matter of law and actual prejudice to the defendant, and the conviction was reversed and the case was remanded for a new trial.

. We note, as mentioned above in this opinion, that Juror A.S., who was known as Juror A.K. when she served on McWhorter’s jury, testified as follows:
"THE WITNESS: [L.B.] was standing, and she started telling a story about how years before I’m not sure exactly how long before, but years before her father had been murdered, and that, to my best recollection, he wasn’t — I’m not sure if he went to jail or he didn’t go to jail, but she now had to walk around in the same town where this man was that killed her father. And she was crying.
[[Image here]]
“A. She had made a comment that, basically, you just don’t know how it feels to have to walk around and be around this person that has done this.”
(R. 462-67.) The State does not address her testimony in its brief, and the circuit court did not discuss her testimony in its order. (C. 1115-92.) In ruling on the discovery motions, the circuit court allowed Juror A.S. to testify on a limited basis.

. Rule 28(a)(10), Ala. R.App. P., requires that arguments in an appellant’s brief contain "citations to the cases, statutes, other authorities, and parts of the record relied on.”

. We note that to the extent the evidence would have been cumulative or inconsistent with the mitigation strategy, the circuit court’s order addresses the evidence, albeit indirectly.

. We note that McWhorter alleged several other Brady violations in his amended petition but did not raise them in his brief to this Court. The claims McWhorter presented in his amended petition but does not pursue on appeal are deemed to be abandoned. See, e.g., Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995) (" ' "[Ajllegations ... not expressly argued on ... appeal ... are deemed by us to be abandoned.” United States v. Burroughs, 650 F.2d 595, 598 (5th Cir.), cert. denied, 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981).’ Burks v. State, 600 So.2d 374, 380 (Ala.Crim.App.1991). We will not review issues not listed and argued in brief. Burks.").

. The Alabama Supreme Court’s language in Pierce closely resembles the language of Rule 32.1(e)(1). Caselaw appears to conflate the "newly discovered" language of Rule 32.1(e) with the requirements of Rule 32.2(a)(3) and 32.2(a)(5) by upholding a petitioner’s failure to plead “newly discovered evidence” as grounds for procedurally barring his claim under Rule 32.2.